EUGENE BORDA ET AL. v. PHILA. & R. R. CO.

APPEAL BY PLAINTIFFS FROM THE COURT OF COMMON PLEAS
NO. 4 OF PHILADELPHIA COUNTY.

Argued March 25, 1891—Decided April 13, 1891.

Where judgment was entered upon the award of a referee, in a submission
under § 6, act of June 16, 1836, P. L. 718, (—in this case, an action
ex delicto against a railroad company for unlawful discriminations,)
the specifications of error, relating chiefly to the referee's findings of
fact, being approved by the court, and the testimony not being fully
presented, the findings cannot be reviewed, even if it were proper un-
der the act.

Before PAXSON, C. J., STERRETT, GREEN, CLARK and WIL-
LIAMS, JJ.

No. 148 January Term 1880, Sup. Ct.; court below, No.
2335 (O. D. C.), C. P. No. 4.

On October 16, 1874, Eugene Borda and others, trading as
Borda, Keller & Nutting, brought case against the Philadel-
phia & Reading Railroad Co., filing a narr in tort to recover
damages alleged to have been sustained by the plaintiffs by
reason of illegal discriminations against them in the charges
for the carriage of coals on the defendant's railroad.

The narr as originally filed contained two counts. The first
count averred that the defendant was a common carrier for
hire, from certain places in the Schuylkill coal region of Penn-
sylvania to Port Richmond, in Philadelphia, and the owner
and operator of a railroad between those places and Port Rich-
mond; and that on divers days and times during the year 1869
the plaintiffs tendered to the defendant a large quantity of
coal to be carried to Port Richmond and there delivered to the
plaintiffs, or their order or consignees, to be thence shipped to
points east of New Brunswick, and were ready and willing, and
offered to pay them such sums of money as they were legally
entitled to receive for the receipt, carriage, and delivery of
said coal, being no higher rate than was then required by de-

fendant to be paid by any other customers of defendant for the same service, under like circumstances. It was alleged that the defendant, not regarding its duty as such carrier, although it did at the said times receive and carry coal for certain other persons from said places to Port Richmond, to be thence shipped to points east of New Brunswick, under like circumstances, for the same price which it required the plaintiffs to pay and which they did pay, yet repaid to such other persons, out of the price so paid by them, a certain drawback, to wit: $1.65 per ton for steamer coal, $1.50 per ton for broken coal, $1.15 per ton for egg coal, and $1 per ton for stove coal, which drawbacks it did not allow or pay to the plaintiffs for their coal of the same kinds; whereby, to the amount of the said drawbacks, the plaintiffs were obliged to and did pay to the defendant an excessive, illegal, and unreasonable charge for the receipt, carriage, and delivery of their coal. The count concluded with an averment that the defendant wilfully made the said unreasonable and illegal preference and discrimination of charges in favor of such other persons and against the plaintiffs, well knowing and intending that such other persons would be thereby enabled, and they were thereby enabled, largely to increase their business in the sale of said coal in the markets east of New Brunswick, at the expense of and to the great injury of the plaintiffs' business in the same markets, which had theretofore been very large.

An additional count was subsequently filed, like the first count in all respects, except that it averred that the defendant, secretly and without the knowledge of the plaintiffs, repaid the drawbacks to the other persons.

The second count alleged that the defendant carried coal for others in 1871 for $1.20 per ton, and in 1872 for $1 per ton, but required the plaintiffs to pay an increased rate for the same service, rendered during the same time and under the like circumstances.

The cause being put at issue was referred on October 30, 1877, by agreement of the parties, to *Mr. Peter McCall*, as referee, under the provisions of § 6, act of June 16, 1836, P. L. 718.

On November 29, 1879, the referee filed his report. Upon the preliminary question whether, prior to § 3, article XVII. of

the constitution, it was the duty of the defendant to carry without discrimination, the referee,—citing Fitchburg Ry. Co. v. Gage, 12 Gray 393; Eclipse Tow-Boat Co. v. Railroad Co., 24 La. Ann. 1; Johnson v. Railroad Co., 16 Fla. 623 (26 Am. Rep. 731); New Eng. Exp. Co. v. Railroad Co., 57 Me. 188 (2 Am. Rep. 31); Messenger v. Railroad Co., 8 Vroom 531 (18 Am. Rep. 754), affirming s. c., 7 Vroom 407; Sandford v. Railroad Co., 24 Pa. 378; Shipper v. Railroad Co., 47 Pa. 338; Cumb. V. R. Co.'s App., 62 Pa. 218; Audenried v. Railroad Co., 68 Pa. 380; Twells v. Railroad Co., 3 Am. L. Reg., N. S., 728; Camblos v. Railroad Co., 4 Brewst. 563,—reported:

I regard it, then, as settled law in this state, that a railroad company, a common carrier, owes a duty of equality to every citizen; and I adopt the position taken by Mr. Bullitt, in argument, that railroad companies have no right to make any undue discrimination or preference in their charges; and a charge made to one shipper higher than to another, for the same service, under like circumstances, constitutes undue preference and discrimination, and by consequence renders the charge unreasonable. Such is the general rule, and it is vastly important to the general public that there be no undue relaxation of this rule; for, exercising, as they practically do, a monopoly of transportation on their roads, railway managers have in their hands a tremendous power, by discrimination, to enrich one man and ruin another. The equality, however, which is thus prescribed, is not a strict and literal equality under all circumstances however varying and different. It is rather an equality in the sense of freedom from unreasonable discrimination. It is only unjust, undue, or unreasonable discrimination, against which the law has set its canon.

Arbitrary discrimination is illegal; so, discrimination made with a view of giving advantage to one person. But the truism that circumstances alter cases applies here, and under a different state of circumstances, a discrimination may be reasonable and lawful, which, were the circumstances the same, would be undue and unreasonable. In order to render lawful an inequality of charge, the goods must be carried under different circumstances, and the question whether the difference is material or essential arises in each particular case.

It is impossible to lay down with any precision the limits of

these qualifications of the general rule. Special agreements reducing the rate of tolls have received the sanction of the English courts, only where it has been made clear that the motive was to promote the interests of the carrying company by a legitimate increase of its traffic.

—Citing upon the statement of the last preceding paragraph, Strick v. Canal Co., 16 C. B., N. S., 244; Nickolson v. Railroad Co., 5 C. B., N. S., 366; Twells v. Railroad Co., 3 Am. L. Reg. N. S., 728; Shipper v. Railroad Co., 47 Pa. 341; Hersh v. Railway Co., 74 Pa. 181; London etc. R. Co. v. Evershed, 3 L. R. App. C. 1029; McDuffee v. Railroad, 52 N. H. 430 (13 Am. Rep. 72), the report proceeded:

It was contended by Mr. Gowen, that even if the rule of equality applies to companies invested with other powers, it does not apply to the Philadelphia & Reading Railroad Co., which by its charter, act of April 4, 1833, P. L. 144, has a monopoly of tolls, but not of transportation. The company was incorporated as a railroad and transportation company, and it was provided that the toll should not exceed four cents per ton per mile. But no special privileges were granted to them as transporters. The privilege of putting cars and motive power upon the road was conceded to them, but to no greater extent than to the public generally.

The right of this company to charge freight for transportation came up in Boyle v. Railroad Co., 54 Pa. 310, where it was held that toll was a tribute paid for passage, not for carriage, and that the proviso was not intended to limit the charges which they might make in their business transactions.

Further, by act of April 3, 1862, P. L. 234, the privileges conferred on the Schuylkill Navigation Company, by act of April 5, 1859, P. L. 372, were extended to the Reading railroad company. By this act, the Schuylkill Navigation Company were empowered to contract for the transportation of anthracite coal and other articles, and to include the charge for such transportation in their charge for tolls. It was argued for the defendant, that the risk of unreasonable or unequal charges was guarded against by transportation being thrown open to public competition, and that no legal wrong was done to the plaintiffs when the company charged them for toll and transportation both, less than they had a right to charge them for

tolls alone. And Cumberland V. R. Co.'s App., 62 Pa. 218, was referred to as a decision to the point that so long as the charter rates are not transgressed, there can be no question of equality as an element of reasonableness where specific charges are provided by the charter.

But I do not think that this conclusion can legitimately be drawn from that case. The court below had granted an injunction restraining the company from charging more for toll and transportation, or motive power, on freight carried in the cars belonging to individuals, than on freight carried in the company's cars, or the cars of any other company. The Supreme Court held this decree to be ultra the bill, which contained no charge to justify it. Judge THOMPSON, delivering the opinion of the court, does say that, even if it had been charged in the bill that more was demanded for transportation in the plaintiff's cars than in the company's, yet as the excess was not greater than the charter allowed, it was not wrong to demand it. If the learned judge had said that the company could charge one private transporter more than another private transporter, his opinion would have been in point; but no such complaint was made, and the question of inequality of rates between individuals of the same class of transporters did not arise. The company had a right to discriminate between rates of freight of private transporters who used their own cars, and rates of freight carried in the cars of the company.

It was further contended by Mr. Gowen as a matter of constitutional law, that the regulation of commerce between the states being exclusively vested in congress, no state rule or regulation affecting the exportation or transportation for exportation of any goods can have validity, and therefore the Reading railroad company could make any contract they pleased for the exportation of coal from Philadelphia to any other state, without being embarrassed by any state rule or regulation on the subject; that in the absence of congressional regulations, such commerce should be absolutely free and untrammeled. In support of this he referred to Hall v. De Cuir, 5 Otto 485, the case of a colored woman who took passage in a steamboat sailing from New Orleans to Vicksburg, and being excluded from the ladies' cabin, brought an action to recover the penalty provided by a statute of Louisiana. But the Supreme Court of

the United States hold that the act of the legislature of Louisiana was a regulation of inter-state commerce, so far as it had the operation of subjecting to damages the owner of a vessel excluding colored passengers on account of their color, from the ladies' cabin, and was to that extent unconstitutional and void. The State Freight Tax Case, 15 Wall. 232, was also referred to in support of this proposition.

And it was contended that congress had actually undertaken to regulate railroad transportation between the states in the Revised Statutes, § 5258, p. 1022. The provision of this section is that every railroad company in the United States, whose road is operated by steam, is authorized to carry upon and over its road all passengers, freight, and property, on their way from any state to another state, and to receive compensation therefor, and to connect with roads of other states, so as to form continuous lines for the transportation of the same to the places of destination.

It will be observed that congress has thus far made no provision on the subject of discrimination by railroad companies. A bill is now pending before it to regulate inter-state commerce, and to prohibit unjust discrimination by common carriers, which makes it unlawful for any person or persons engaged in the transportation of property by railroad, from one state or territory to or through one or more other states or territories of the United States, or to or from any foreign country, directly or indirectly to charge to or receive from any person or persons any greater or less rate or amount of freight, compensation, or reward than is charged to or received from any other person or persons for like and contemporary service, in the carrying, receiving, delivering, storing, or handling of the same. But congress has not yet legislated on the subject, and I apprehend that the rule is correctly stated by C. J. WAITE, in the case referred to, Hall v. De Cuir, that, " by refraining from action, congress in effect adopts as its own regulations those which the common law, or the civil law where that prevails, has provided for the government of such business." No one surely would contend that the Reading railroad, as a carrier, is not subject to the common-law responsibility for all cases except by the act of God and the public enemy, by reason of the existing legislation of congress above referred to.

Further the Reading railroad is situate wholly within this state. In the case of the Chicago, Burlington & Quincy Railroad Co. v. Iowa, 4 Otto 155, it was held that a state may regulate the charges of railroads situate entirely within the state, even though those engaged in commerce among the states might sometimes use the railroad in the prosecution of their business. "The objection," said C. J. WAITE, "that the statute complained of is void because it amounts to a regulation of commerce among the states, has been sufficiently considered in the case of Munn v. Illinois. This road, like the warehouse in that case, is situated within the limits of a single state. Its business is carried on there, and its regulation is a matter of domestic concern. It is employed in state as well as interstate commerce; and, until congress acts, the state must be permitted to adopt such rules and regulations as may be necessary for the promotion of the general welfare of the people within its own jurisdiction, even though in so doing those without may be indirectly affected." See also Munn v. Illinois, 4 Otto 113, and Peik v. Railway Co., 4 Otto 164.

It was further contended by Mr. Gowen that even admitting the rule of equality of rates to be applicable, the plaintiffs had no cause of action, because they had no special grievance over other shippers; that it was analogous to the case of the obstruction of a highway, which is a public nuisance, and gives no cause of action to individuals sustaining no greater injury than the rest of the communities using the highway. The reason assigned is, that it would be found impracticable to give a civil remedy for each individual, the object being to avoid multiplicity of actions, for if any one man might have an action, all men might have the like. But the law for this common nuisance has provided an apt remedy by indictment; unless a man has sustained a particular damage, in which case he has his action on the case: Co. Litt., 56 a. Thus, in Payne v. Partridge, 1 Salk. 12, the case of a common ferry for all persons paying toll, except the inhabitants of Littleport, who were toll free, an inhabitant of Littleport was held entitled to bring his action for taking toll, but not for keeping up the ferry, the former being a private, the latter a public right. If toll was exacted and paid by him, that was a special damage.

Lord Holt in Ashby v. White, 2 Lord Raym. 955, uses this

language : " It is no objection to say that it will occasion mul-
tiplicity of actions ; for, if men will multiply injuries, actions
must be multiplied too ; for every man that is injured ought to
have his recompense.    Suppose the defendant had beaten forty
or fifty men, the damage done to each is peculiar to himself,
and he shall have his action ; so, if many persons receive a
private injury by a public nuisance, every one shall have his
action, as is agreed in Williams's Case, 5 Co. 73 a, and West-
bury v. Powell, Co. Litt. 56 a."    The law has said, from the
Year-books downward, that if a party has sustained any pecu-
liar injury beyond that which affects the public at large, an
action will lie for redress: TINDAL, C. J., in Wilkes v. Hun-
gerford, 2 Bing. N. C. 281.

The injury in the present case is not one affecting the plaint-
iffs in common with the whole public, and I am therefore of
opinion that the action may be maintained.    Indeed, the point
is settled by the decree in Twells v. Railroad Co., before re-
ferred to, which directed that the defendant should pay to the
complainant the excess over the ordinary or usual rates of
freight paid by the complainant to the defendant before the
filing of the bill, with interest, to wit, the sum of $1,984.60,
afterwards reduced to $1,924.86.

It was contended on behalf of the defendant that the relation
of principal and agent between the plaintiffs and those for whom
they were factors had ceased to exist when this suit was
brought, and that no case goes to the extent of deciding that
where the agency has been closed a factor remains the repre-
sentative of his principal for the purpose of vindicating wrongs
sustained by him, and that the present action is brought to re-
cover damages for an injury sustained by the firm of Keller,
Borda & Nutting, and not for an injury sustained by their
principals.

In support of this view, the case of United States v. Villa-
longa, 23 Wall. 35, was referred to, in which it was held that
under the Abandoned and Captured Property Act, which gives
to the owner of any such property a right, after it has been
sold by the government, to recover the proceeds of it in the
treasury, a factor who has merely made advances on the prop-
erty, there being another person having the legal interest in
the proceeds, is not to be regarded as the owner.    In this case,

Referee's Report.

Judge STRONG said no doubt a factor who has made advances upon goods consigned to him, may be regarded in a limited sense and to the extent of his advances as owner: yet, in reality, he has but a lien with a right of possession of the goods for his security. He may protect that possession by suit against a trespasser upon it. But, after all, he is not the real owner. It is no more than the ownership of a lien or charge upon the property.

To this it was replied, that the question was not who owned the coal, but who employed the carrier. The duty to carry impartially is to those who employ the carrier, not to those who own the goods carried. Here the plaintiffs sold in their own names. Their principals were undisclosed. The bills for tolls were made to them in their own names, and paid by them in their own names. The case of Sandford v. Railroad Co., 24 Pa. 378, and the other express company cases, were relied on to sustain this view.

In Pickford v. Railway Co., 10 M. & W. 399, the case of packed parcels, where it was argued that each separate owner might maintain a separate action, on the custom of England, in respect of his own goods, in case of loss or damage by neglect, PARKE, B., said it was very doubtful, at least, whether on the custom of England, separate actions could be maintained, as the relation of employer and carrier would not have existed between them and the company, but between them and the plaintiffs.

It is true that a plaintiff cannot join in the same declaration demands de jure alterius and in proprio jure. Thus, he cannot join an action in his own right with an action by him as executor or administrator: See Hooker v. Quilter, 1 Wils. 171; Rogers v. Cooke, Carth. 235; 1 Salk. 10, and Peries v. Aycinena, 3 W. & S. 71. But I apprehend the rule is otherwise where the legal title to the demands is in the same person, and he is not compelled to designate himself as acting in jure alterius: See Mayall v. Railroad Co., 19 N. H. 122 (49 Am. Dec. 149); case for loss of a package of bonnets; it was held that the plaintiff could recover, although a third person might have an interest in his business. The court said: "The contract was made between the defendant and the plaintiff, and not between the defendant and any other person. She may or not

be answerable to some third person for a part of the damages she may recover from the defendant. The legal interest in the contract resides in her, and she is the proper person to enforce it."

On the whole, I think that the plaintiffs can recover in this action damages for unjust discrimination on the coal shipped by them as factors, as well as on that owned by them in their own right.

Lastly, it was contended by Mr. Gowen, that the payments of the charges for freight were made by the plaintiffs voluntarily, and without protest, and therefore could not be recovered back. In reply it was said that the plaintiffs made these payments under a mistake of fact, not knowing that Audenried & Co. were paying from a dollar to a dollar and a half per ton less than they were paying, and that overcharges by railroad companies amounted to extortion. The simple answer, however, is that this is not an action to recover back the freights paid, but is an action of tort, to recover damages for a breach of the defendants' duty to the plaintiffs. . . . .

—Determining the facts in connection with a discussion of the testimony by which they were found, the referee continued:

The plaintiffs' case under the first and additional counts of the declaration rests upon a wilful discrimination in favor of Audenried & Co., by which, as set forth in the pleading, I understand an intentional discrimination, made deliberately and with the purpose of increasing their business to the injury of the plaintiffs' business. The word " wilful " in this connection is not surplusage. It means a great deal. Wilful discrimination in my judgment means a great deal more than mere discrimination. It means discrimination, made knowingly and intentionally, with the dishonest design of building up the fortune of Audenried & Co. at the expense of Borda, Keller & Co.

The defendant's case denies that the discrimination was wilful and made with any such design as imputed by the plaintiffs. It rests upon the ground that the payment of the drawbacks to Audenried & Co. was made under an honest and bona fide belief that they were entitled to them, under an arrangement by which, in consideration of their having made contracts early in the spring for delivery of coal at fixed prices throughout the

season, they were allowed the drawbacks in question. In short, that the drawbacks were paid under an entire misapprehension of the facts; and that there was no intention to favor Audenried & Co., or to give them any advantage which they would not have extended to any other shipper under the same circumstances.

The question is, how far is the charge of wilful discrimination sustained by the evidence? . . . .

On the whole, I am of opinion, upon the best consideration I have been able to give the subject, that the defendant did not pay to Audenried & Co. the drawbacks complained of in the first and additional count of the declaration, wilfully and with intent to enable them to increase their business at the expense of the plaintiffs, but that it paid the same in good faith, under the belief that Audenried & Co. had made contracts in the spring at a fixed price for delivery of the coal. . . . .

The expediency of permitting special agreements and special rates by railway carriers is one of the questions of the day, entering into the problems of railway management. But, until the legislature shall cut up by the roots all special agreements and special rates, I apprehend it cannot be safely affirmed that all such agreements are per se unlawful although discriminating. The true question in each particular case as it arises is, whether the special agreement is reasonable under all the circumstances, and honestly made with a single eye to the interest of the railway company. If it be so, then the only responsibility resting on the company is that they be willing to make the same agreement with every other person under the like circumstances.

Now, as long as such special agreements are tolerated, it is obvious that the power of making such agreements, pro re nata, must for all practical purposes be vested in some officer of this company, or committee of the board. In the present case, although there existed no rule or regulation of the company authorizing the agreement which Mr. Smith authorized to be made with Audenried & Co., I do not think the board of managers could have successfully denied his authority to make such agreement. No question seems to have been raised as to his authority.

And I am further of opinion that the agreement, authorized

by Mr. Smith to be made with Audenried & Co., if in other re-
spects free from objection, was not invalidated by reason of its
not being notified to the plaintiffs. In point of fact, no notice
of such agreement with Audenried was given to any other ship-
per. But, in point of law, I do not think that the duty of giving
notice to the world of every special rate rests upon the carrier,
under penality of being guilty of unlawful discrimination by
his omission to give such notice. How, and to whom, is such
notice to be given? All that could reasonably be required of
the defendant was that it be ready and willing to transport for
all others, under the like circumstances, at the same rate as for
Audenried & Co. There is no evidence of its not being will-
ing to do so. Its willingness was not put to the test by the
plaintiffs. Had they made contracts for the sale of coal early
in the season, at fixed prices, and then been refused the draw-
backs allowed to Audenried & Co., the case would have been
very different. But they did not make such contracts, not
deeming it their interest to do so.

The question then is, was the discrimination made by the
agreement with Audenried & Co., authorized by Mr. Smith, a
reasonable one, and honestly made with a view to the interests
of the company? . . . . .

At the bottom of this subject lies the broad question, whether
a railroad company may lawfully regulate its rates, with refer-
ence to the price of the merchandise transported.

On behalf of the defendant, it was contended that there is
nothing to prevent a railroad company from regulating its rates
by the price of the article transported; that, practically, the
market price of the article regulates the rate, and the cost of
transportation is a percentage on the price. In support of this
view, the cases of the Del. & H. Canal Co. v. Coal Co., 21 Pa.
131, and Commonwealth v. Canal Co., 43 Pa. 295, were re-
ferred to. These cases, however, do not settle the point, be-
cause the question of discrimination based upon price did not
arise in them.

On the other hand, it was contended for the plaintiffs, that
mere difference of price at which articles of the same kind
may have been sold, does not warrant discrimination in rate of
charge for carriage; for which position, Twells v. Railroad Co.,
3 Am. L. Reg. N. S., 728; Sandford v. Railroad Co., 24 Pa.

Referee's Report.

378, and other cases, were cited, which, however, while they establish the general duty of equality of rates, do not, I think, settle the precise question under consideration. I regard the question as still an open one; and my opinion is, that the price at which the article transported is sold, is a reasonable element in fixing the rate of transportation. Practically, it cannot be ignored in fixing rates. If a rate totally disproportioned to the value of the article transported be demanded, it is obvious that traffic must be paralyzed, and the business of the road diminished.

It seems to me, therefore, that the interests of a railroad company require that the element of price, whether by a sliding scale or otherwise, must be permitted to enter into the rate of transportation, and that a discrimination based on that element is not an arbitrary or unreasonable discrimination, offending against the rule of equality. It was assuredly for the interest of the defendant to secure a large tonnage on their road, by encouraging contracts made in the spring for delivery of coal during the season.

I am of opinion, therefore, that the defendant could legally have allowed the drawbacks to Audenried & Co., which it did allow, if that firm had had contracts made in the early part of the season for delivery of coal in the Eastern market at fixed prices. In that case, although the service rendered to Audenreid & Co., to wit, the transportation, would have been the same as that rendered to the plaintiffs, yet the circumstances were different, and the difference of circumstances would have justified the discrimination. . . . .

—The referee, therefore, concluded that the plaintiffs had failed to make out their case under the first and additional counts of the declaration. Taking up the case under the second count, he held that it presented no question of fact, but simply a question of law, whether the defendant company had a right to discriminate with reference to the price at which the coal transported was sold, as to which he had already expressed his opinion. Accordingly he found that the plaintiffs had no cause of action under this count, and on the whole case he awarded in favor of the defendant company.

To the report of the referee the plaintiffs filed fifty-seven exceptions, chiefly relating to the referee's findings of fact, certain of which alleged that the referee erred:

Opinion of the Court.

54. In not awarding in favor of the plaintiffs, under the first and additional counts, the sum of $62,914.58, with interest from December 1, 1869.

57. In not finding in favor of the plaintiffs, under the second count in the narr, for the sum of $7,355.91, with interest on $4,384.65 thereof, from December 31, 1871, and on the balance thereof, viz., $2,971.26, from December 31, 1872.

Said exceptions, with nineteen exceptions filed on behalf of the defendant company, chiefly relating to the referee's conclusions of law upon the subject of discriminations, having been argued before the court in banc, an opinion was filed as follows:

The court, while they do not concur with the referee in all the conclusions of law announced in his report, being nevertheless of opinion that upon the whole case his finding in favor of the defendant is correct, it is ordered that the exceptions be dismissed and judgment entered for the defendant upon the award.

—Judgment having been entered, the plaintiffs took this appeal, filing sixty-seven assignments, specifying the dismissal of the plaintiffs' several exceptions and the entry of judgment for the defendant on the report of the referee, for error.*

*Mr. Geo. M. Dallas* and *Mr. John C. Bullitt* (with them *Mr. Geo. L. Crawford*), for the appellants.

*Mr. John G. Johnson* and *Mr. Thomas Hart, Jr.*, for the appellee.

PER CURIAM:

This action was commenced in the court below in the year 1874, and was referred to the late Peter McCall, Esq., under the act of June 16, 1836. After a thorough and exhaustive discussion of the case, both upon its law and its facts, he made an award in favor of the defendant. A large number of exceptions were taken below to his award, which were overruled by the court. Sixty-seven assignments of error were filed in this court, nearly all of which are to the learned referee's findings

---

* The testimony was not fully presented in the paper-books, only those portions alleged to support the plaintiffs' exceptions to the referee's report.

Statement of Facts.

of fact.    It is sufficient to say, in reference to the latter, that we have not the testimony before us, and for this reason cannot review them, even were it proper to do so under the act of 1836. Conceding the facts as found by the referee, we cannot say his conclusions are wrong, and we affirm the judgment upon his report.

Judgment affirmed.