# Hoover et al. *v.* Penna. R. R., Appellant.

[Marked to be reported.]

*Common carrier—Railroad company—Discrimination in rates.*

Railroad companies have no right to make any undue discrimination or preference in their charges; and a charge made to one shipper higher than to another, for the same service, under like circumstances, constitutes undue preference and discrimination, and consequently renders the charge unreasonable. The equality, however, which is thus prescribed, is not a strict and literal equality under all circumstances, however varying and different. It is rather an equality in the sense of freedom from unreasonable discrimination.

*Discrimination—Act of June 4, 1883.*

The act of June 4, 1883, P. L. 72, prohibits only such discrimination as is undue or unreasonable, and the prohibited discrimination is further limited by the consideration that it must be " for a like service, from the same place, upon like conditions and under similar circumstances."

*Discrimination as between manufacturer and coal dealer.*

A railroad company may charge a lower rate of freight for coal transported to a manufacturing establishment from which it obtains manufactured products for transportation, than to a coal dealer whose business with the railroad company is limited merely to the coal transported. In such a case there is no equality of conditions which will justify the coal dealer in demanding the rate which is given to the manufacturing company.

*Sale of coal by manufacturing company enjoying special rate—Effect of notice to carrier.*

The fact that a manufacturing company, which is given a reduced rate on its coal, sells some of its coal to its employees, will not render the railroad company transporting the coal liable for unlawful discrimination, if the railroad company has no knowledge of such sales.

A manufacturing company, however, has no right to engage in the business of selling coal, even to its own employees, and if it does so, and the transporting company is notified of such selling, it must thereupon cease to carry coal to the manufacturing company at any less rate than it charges to coal dealers, or incur the penalties of unjust discrimination.

*Facts under act of 1883—Province of court and jury.*

In an action to recover damages for an alleged unlawful discrimination, the question whether the words of the act of June 4, 1883, P. L. 72, extend to and embrace the established facts of the case, is a question of law for the court, and beyond the functions of the jury.

*Rebates—Secret discrimination.*

Where a rebate does not in itself constitute an unlawful discrimination, the fact that it was kept secret between the parties will not render it unlawful.

*Measure of damages—Treble damages—Act of June 4, 1883.*

Under the act of June 4, 1883, P. L. 72, the party injured by unlawful discrimination cannot recover three times the amount of the difference between the charges, unless the amount of the difference is actually equal to the " amount of injury suffered." In such a case the defendants have a right to require very clear and definite proof as to what the actual damage was.

*Evidence—Custom—Difference of rates.*

Where it appears that differences of freight rates on coal to manufacturers and to mere dealers have been for many years in universal practice, and no case except the one before the court for decision has reached the courts of last resort in England or in the United States, questioning the entire legality and propriety of such differences, the court will consider this circumstance as ample proof that the practice has been assented to both by the professional and lay mind.

*Constitution—Special law regulating trade, etc.—Art. 3, § 7.*

The act of June 4, 1883, is not in conflict with art. 3, § 7, of the constitution, which forbids any special law regulating labor, trade, mining or manufacturing.

Argued April 17, 1893.    Appeal, No. 143, July T., 1893, by defendants, from judgment of C. P. Huntingdon Co., Feb. T., 1892, No. 17, on verdict for plaintiffs, A. M. Hoover et al.    Before STERRETT, C. J., GREEN, MITCHELL, DEAN and THOMPSON, JJ.

Trespass for damages for alleged unlawful discrimination.

At the trial, before FURST, P. J., it appeared that, in 1881, the defendant agreed to transport coal from the Snow Shoe District to the works of the Bellefonte Iron & Nail Company for the sum of thirty cents per ton, provided the nail company consumed at least twenty tons per day.    It appeared that the coal was to be tariffed at the usual public rate of fifty cents per ton, and that a rebate of twenty cents per ton net would be repaid by the railroad company to the nail company.    In 1889, plaintiffs became retail coal dealers in Bellefonte, and were charged by the railroad company the usual public rate for the transportation of their coal.

Defendants presented the following points:

" 1. The agreement to charge a uniform rate to the Bellefonte nail works, made in 1881, was binding on the defendant; and its performance was not an undue and unjust discrimination against the plaintiffs.    *Answer:* So far as the contract be-

ing binding on the defendant in 1889 and up to 1891, we are not prepared to affirm the point. This action is not brought to enforce that contract. The question of the contract is, therefore, immaterial and irrelevant. We cannot say, as matter of law, that the contract was binding upon the company. Its terms seem to be indefinite, and whether they could or could not have retreated from it is a question that is not important here; and, if it be, we cannot say it was binding upon them. But whether or not the performance of that contract resulted in undue and unjust discrimination against these plaintiffs is a question we submit to you in our general charge. If it operated in a certain manner it would be undue and unjust, and if it did not operate in that manner it would not be undue and unjust. For further answer we refer to our general charge as to the fact of discrimination." [1]

" 2. The defendant has made no undue charge or unjust discrimination against the plaintiffs, if they were charged the same as other buyers and sellers of coal. *Answer :* This point we cannot affirm. The fact involved in the point will be for the determination of the jury." [2]

" 3. A lower charge to a manufacturer of nails is not an unjust discrimination to a buyer and seller of coal only. *Answer :* We cannot affirm that as a principle of law. It may be or may not be, according to the circumstances of the case; but whether, in this case, it resulted in an undue and unjust discrimination must be determined by you under the evidence." [3]

" 4.. As there was no undue discrimination in furnishing facilities for transportation, treble damages cannot be recovered in this case; and the verdict must be for the defendant." Refused. [4]

" 5. Under all the evidence in the case the verdict must be for the defendant. *Answer :* We refuse this point because, as the case is presented by the plaintiffs, we submit the question of undue and unjust discrimination to you." [5]

Verdict and judgment for plaintiffs for $6,364.20. Defendants appealed.

*Errors assigned* were (1–5) instructions, quoting them as above; (6) that the judgment of the court below is unlawful. It imposes special damages and is in conflict with § 7 of article

3 of the constitution of this state, which forbids any special law regulating labor, trade, mining, or manufacturing.

*David W. Sellers, W. & J. D. Dorris* with him, for appellant. —The agreement to charge a uniform rate to the Bellefonte nail works, made in 1881, was binding on defendant; and its performance was not an undue and unjust discrimination against plaintiffs : Coxe Brothers v. Lehigh Valley R. R., 3 Interstate Com. R. 460 ; Comrs. v. B. & O. R. R., 145 U. S. 275; Hersh v. N. Central R. R., 74 Pa. 182 ; Munhall v. Allegheny Valley R. R., 92 Pa. 150 ; Borda v. Reading R. R., 141 Pa. 484.

Appellant in making the contract with the nail company in 1881 was assuredly acting for its interests to secure tonnage, and it could not have intended to give an advantage against plaintiffs, inasmuch as they had not commenced business.

The capacity of a railroad company to increase its business by special rates to shippers is recognized elsewhere : Baxendale v. R. R., 94 E. C. L. 353; Nicholson v. R. R., 94 E. C. L. 366; Fitchburg R. R. v. Gage, 12 Gray, 393 ; Messenger v. P. R. R., 36 N. J. L. 408.

Defendant has made no undue charge or unjust discrimination against plaintiffs, if they were charged the same as other buyers and sellers of coal.   A lower charge to a manufacturer of nails is not an unjust discrimination to a buyer and seller of coal only.

As there was no undue discrimination in furnishing facilities for transportation, treble damages cannot be recovered in this case ; and the verdict must be for defendant : Wigton v. R. R., 25 W. N. 574.

The act of 1883 is special with regard to the trade of a common carrier considered as a division of labor or a pursuit, or relatively to the railroad as a special method of domestic transportation.   For centuries the pursuit of a common carrier has been private like that of an inn keeper.   Each owe duties to the public, but this does not make the pursuit public : Market Co. v. Terminal Co., 142 Pa. 581.

*George B. Orlady,* for appellee.—The authorities cited by appellant are in cases entirely different from this.

In Coxe Bros. v. L. V. R. R., 3 Interstate Com. R. 460, the controversy was in regard to freight, different in character as to bulk, kind, value and quantity, and hauled different distances.

In Comrs. v. B. & O. R. R., 145 U. S. 275, it is said the commission is not designed to prevent competition between different roads, or to interfere with the customary arrangements made for reduced fares in consideration of increased mileage, when such reduction does not operate as an unjust discrimination against other persons traveling over the road. To the same effect is Messenger's Case, 36 N. J. L. 407.

In the language of the books, a common carrier exercises a public employment: 1 Bacon Ab. (B) 556.

The business of the common carrier is for the public, and it is his duty to serve the public indifferently. He is entitled to a reasonable compensation, but on payment of that he is bound to carry for whoever will employ him, to the extent of his ability. A common carrier can make what contracts he pleases. The public have no interest in that, but a service for the public necessarily implies equal treatment in its performance when the right to the service is common.

The contract between a railroad company and a shipper that the latter shall pay the regular established rates of freight the same as all other shippers, and that the company shall pay back to him by way of rebate a certain proportion of freight so charged and paid, whereby a less rate of freight is paid than by the public generally, is void and against public policy : I. D. & S. R. R. Co. v. Ervin, 118 Ill. 250 ; Rice v. R. R., 3 Interstate Com. R. 263; N. E. Express Co. v. M. C. R. R. Co., 57 Me. 188 ; Hutchinson on Carriers, sec. 297, 353.

The argument that plaintiffs sustained no damages, because they sold their coal at full market price, is without merit. The net cost of the coal would ordinarily be considered, and under this evidence the nail company sold coal in the same market from fifty to seventy-five cents per ton below the market price, which would amount to more than any expected profit on coal : Camblos v. P. & R. R. R., 4 Brewster, 563.

The effect of a reduced rate to a favored dealer is to reduce plaintiffs' profits to the extent of such reduction, making an undue and unjust discrimination : Goodridge v. U. P. Ry. Co., 37 Fed. R. 182.

The reasonableness of a freight charge is a question of fact, and in general what amounts to undue preference is a question of fact and not of law : Slater v. Ry., 29 S. C. 96 ; Hutchinson on Carriers, § 447 ; Houston & Texas Central R. R. v. Rust, 58 Texas, 98 ; Root v. Long Island Ry. Co., 114 N. Y. 300 ; s. c., 11 Am. St. R. 643 ; Paxton v. Illinois R. R., 6 A. & E. R. R., Cas. 591.

By goods of the same class is meant goods similar in those qualities which affect the risk and expense of carriage ; by shipment under the same circumstances is meant that the goods are conveyed under like circumstances, where the route, risk and expenses are, in the opinion of the jury, the same, otherwise not : Paxson v. R. R., 6 A. & E. R. R. Cas. 591.

The spirit and purpose of our act, like the interstate commerce act, requires that, when the circumstances and conditions will fairly admit of it, the charges for like services should be equal, and that violations of the plain black letter of the law, whether in demanding or receiving higher rates and drawbacks, or discriminating in the furnishing of facilities for transportation, should not be profitable to the offending company : Herriman v. B. C. R. & N. R. R., 57 Iowa, 187 ; Shipper v. R. R., 47 Pa. 338 ; Audenried v. P. & R. R. R., 66 Pa. 370 ; Wigton v. P. R. R., 25 W. N. 574.

Discriminations based solely on the amount of freight shipped are discriminations in favor of capital, contrary to sound public policy, and a wrong to the disfavored : Kinsley v. B. N. Y. & P. R. R., 37 Fed. R. 181 ; Hays v. P. R. R., 12 Fed. R. 309 ; P. & W. C. R. R. v. R. R., 1 Inter St. Com. R. 117 ; Scofield v. R. R., 43 Ohio, 571 ; Rothschild v. Wabash Ry., 15 Mo. Ap. 242 ; Vincent v. C. & A. R. R., 49 Illinois, 35 ; Audenried v. P. & R. R. R., 68 Pa. 370 ; Messenger v. R. R., 18 Am. R. 758 ; Cook v. C. R. I. & P. R. R., 75 Iowa, 169 ; Sharpless v. Mayor, etc. of Phila., 21 Pa. 147 ; N. E. Exp. Co. v. Me. Cent. R. R., 57 Me. 188 ; McDuffee v. Portland etc. R. R., 52 N. H. 430 ; Messenger v. P. R. R., 36 N. J. L. 407 ; Sinking Fund Cases, 99 U. S. 719 ; Ragan v. Aiken, 42 Am. R. 684.

A regulation, to be valid, must operate on all alike. If it deprives any persons of the benefits of the road, or grants exclusive privileges to others, it is against law and void : Sand-

ford v. R. R., 24 Pa. 378 ; Cumberland Valley R. R. Co.'s Ap., 62 Pa. 218.

The regulation by the act of 1883, is not in conflict with any provision of the charter ; it does not take from the corporation any right or privilege, and refers to the conduct of business of common carriers, who derive their right to do business from a charter by license granted by law for the comfort, safety and welfare of society : Cooley's Const. Lim. 708 ; Scofield v. Ry., 43 Ohio, 571 ; Ang. & Ames, Corp. 694 ; Potter's Dwarris, 140 ; E. & N. E. R. R. v. Casey, 26 Pa. 287 ; Sharpless v. Mayor of Phila., 21 Pa. 147.

OPINION BY MR. JUSTICE GREEN, July 19, 1893 :

The third section of the seventeenth article of the constitution of 1874 is in the following words :

"Section 3. All individuals, associations and corporations shall have equal right to have persons and property transported over railroads and canals, and no undue or unreasonable discrimination shall be made, in charges for, or in facilities for, transportation of freight or passengers, within the state, or coming from, or going to any other state. Persons and property transported over any railroad shall be delivered at any station, at charges not exceeding the charges for transportation of persons and property of the same class, in the same direction to any more distant station ; but excursion and commutation tickets may be issued at special rates."

For the purpose of enforcing the foregoing provision of the constitution the legislature enacted the law of the 4th of June, 1883, P. L. 72. The first and second sections are as follows :

"Section 1. That any undue or unreasonable discrimination by any railroad company or other common carrier or any officer, superintendent, manager or agent thereof in charges for or in facilities for the transportation of freight within this state or coming from or going to any other state, is hereby declared to be unlawful.

"Section 2. No railroad company or other common carrier engaged in the transportation of property, shall charge, demand or receive from any person, company or corporation, for the transportation of property, or for any other service, a greater sum than it shall receive from any other person, company or

corporation for a like service from the same place upon like conditions and under similar circumstances; and all concessions in rates and drawbacks shall be allowed to all persons, companies or corporations alike, for such transportations and service, upon like conditions, under similar circumstances and during the same period of time. Nor shall any such railroad company or common carrier make any undue or unreasonable discrimination between individuals or between individuals and transportation companies, or the furnishing of facilities for transportation. Any violation of this provision shall make the offending company liable to the party injured for damages treble the amount of injury suffered."

The action in the present case was brought to recover treble damages under the second section of the act of 1883, for an alleged unjust and unreasonable discrimination against the plaintiffs, in charges for freights on coal shipped from Snow Shoe to Bellefonte within this state, over lines of railroad owned or controlled by the defendant company. The period of time covered by the claim of the plaintiffs was from September, 1889, to April, 1891, and it was alleged that the plaintiffs were overcharged twenty cents per ton on 10,607 tons carried over the defendant's road during the time named. Substantially the defence set up by the defendant was, that in the year 1881 certain citizens of Bellefonte and vicinity, having in contemplation the erection of a manufacturing plant at Bellefonte, for the manufacture of nails, waited upon the defendant company through Governor A. G. Curtin who represented them, and endeavored to make, and did make a special contract, that if the plant was erected the company should not charge them more than thirty cents per ton for all coal shipped from Snow Shoe to the works at Bellefonte; that such contract was made and the plant was then erected and the manufacture of nails thereat was carried on from 1881 until, and after, the time covered by the plaintiffs' claim; that the plaintiffs were coal dealers only who merely bought and sold coal and returned no freight to the defendant as the product of any manufacturing operations; that they did not do any business as coal dealers, in fact did not come into existence until the year 1889, eight years after the nail company was organized and commenced business and while the defendant company was subject to, and

bound by, the terms of their contract with the nail company; and. that the plaintiffs were not discriminated against at all because they were charged only the same freights as were charged to all others who were coal dealers only. And it was contended as matter of law, by the defendant, that the discrimination in the rates for freight between the nail company and the plaintiffs, was not, in view of all the circumstances of the case, an undue or unreasonable discrimination, within the meaning of the constitutional provision or of the act of 1883. In reply to points put to the court on the trial on this subject, the learned judge who tried the cause charged the jury that the question of unjust discrimination was a question of fact to be determined by them, and he refused the defendant's point on that subject. But he did, nevertheless, also instruct the jury, as matter of law, that the distinction between a dealer and a manufacturer set up by the defendant was not a defence, and would not exempt the defendant from the penalties of the act of 1883. He said : " The defence claim, as an exemption from the penalty of this act, the fact that the one may be classed as a manufacturer and the other simply as a dealer. I do not regard the law as making that classification. I think that the classification which the act of 1883 intended was a classification relating to the carriage and not to the shipper himself. It may charge more for one kind of freight than for another. It may charge more for live freight than for wood, coal, iron or ore. It may charge more for a certain portion of its road than it does for others. These things are governed largely by the expense to which the common carrier is subjected. Common carriers may charge more when they ship but a small quantity than they do when they ship by wholesale. . . . But I do not think the law or the policy of the law permits them to classify the kind of dealer; that is, that they may make a discrimination between the character of the consignor or consignee ordinarily . . . . The evidence here is that each shipment was by carloads during the same period of time and under like circumstances. The fact that one party was a manufacturer and the other party were coal dealers we think is not material in this case."

The same idea was repeated, and a positive instruction was given, that upon the facts stated in the plaintiffs' point, " the service and conditions were alike and the circumstances the

same." We regard this as a binding instruction to the jury upon the law of the case, which left them no discretion but to find for the plaintiffs, the only question for them being the amount of damages to be found.

After a very patient examination of all the testimony and of all the authorities cited on both sides, we find ourselves unable to agree with the learned court below, either as to their interpretation of the law, or their judgment upon the facts.

So far as the law of the case is concerned there is no doubt that the act of 1883 does not prohibit all discrimination. It prohibits only discrimination which is undue or unreasonable, and the prohibited discrimination is further limited by the consideration that it must be "for a like service, from the same place, upon like conditions and under similar circumstances." If therefore the discrimination, in a given case, is upon conditions which are not like, and circumstances which are not similar, the act is inapplicable, and its penalties are not incurred. Nor can we regard this question as a question of fact for the jury alone. The ascertainment of the actual facts of the case, of course is for them, but where these are established by undisputed testimony, or are presented by proper points which cover the facts in evidence, the resulting question is whether the facts established, or undisputed, or exhibited in properly drawn points, bring the case within the operation of the words or necessary meaning of the statute, and that, of course, is a question of law for the court. For the question then is one of interpretation. Do the words of the statute extend to, and embrace, the established facts of the case, or do they not? If they do not, the statute is not applicable, if they do, it is, and the court alone, as in all other similar cases, must determine that question. It is beyond the function of the jury.

Let us now recur to the well established, and the undisputed, facts of the case, and inquire whether there are any, and if so what, differences in the conditions, and in the circumstances, which attended the shipping of the coal to the plaintiffs, and to the Bellefonte Iron & Nail Company respectively.

In the first place we find the undisputed testimony of Governor Curtin, to the effect that in 1881 and prior to the erection of the nail works, he called upon the defendant's officials for the purpose of having them agree to carry the coal for the pro-

spective works at thirty cents per ton.   This testimony is clear, distinct, positive and entirely uncontradicted, and it was followed by proof that the contract was carried out by the defendant after some delay in the adjustment.   Governor Curtin said: " I went to Philadelphia for the purpose of having the arrangement made.   I there saw Mr. Creighton, who was the freight agent of the Pennsylvania Railroad Company, and after some time in negotiating he agreed that the freight should be reduced to thirty cents per ton where the amount consumed per day was twenty tons or more.   He wrote me a letter in which it was settled and fixed at thirty cents per ton."   He then explained the loss of the letter and his search for it, and said, " but of the contents of the letter I am perfectly clear in my recollection of it, and it was one of the inducements which contributed to the erection of the nail works in this place.   There were other parties in this place engaged in other industries which would have had a right to the reduction, notably Valentine's Works in operation, and the glass works, when they used the quantity indicated."

As the court below charged directly against any effect being attached to the subject-matter of this testimony, the defendant is entitled to have it regarded as proof of an established fact, and, this being so, we have the following differences in the conditions and circumstances attending the shipments to the plaintiffs and the nail works, respectively:

(1) The defendant, when it began carrying coal for the plaintiffs, in September, 1889, was bound by the terms of a contract made with the nail works eight years before, and during all the intervening time the plaintiffs were not even in existence as a firm, and were doing no coal business whatever.   We know of no reason why that contract was not binding on the defendant, especially as Governor Curtin testified, without contradiction, that all the other industries at Bellefonte were entitled to the benefit of it, if they took the requisite quantity of twenty tons daily.   This being so, the defendant's hands were tied, and it could not charge the nail works fifty cents a ton if it had desired to do so.   This constituted a most material difference in the conditions and circumstances of the shipments.   In an action by the nail works to recover the twenty cents a ton higher charge, if it had been made, to equalize it with the rate charged

to the plaintiffs, it would have been no defence to say that a company of coal dealers had lately come into existence who were getting coal over the same road from the same point, and therefore the defendant would be obliged to charge fifty cents per ton thereafter.

(2) The nail works were bound to take twenty tons every day, while the plaintiffs were under no such obligation.

(3) The plaintiffs were dealers in coal merely while the nail company was a manufacturer of fabrics, and itself consumed the coal it received. They were therefore not competitors in the same business, and a lower rate to the manufacturer would not, under the contract, affect the business of the plaintiffs injuriously. It is true there was proof that the nail company did sell some coal to their own workmen, but as it is not shown that the defendant had any knowledge of this fact they cannot be held responsible for it.

(4) The business of the plaintiffs paid but one freight to the defendant while the business of the nail company paid not only that freight, to wit, for hauling the coal to the nail works, but also, in addition to that, another and entirely independent freight to the defendant on all the products manufactured by the nail company. This was a most important and vital difference in the conditions and circumstances of the two shipments. The authorities are very clear and strong that where an additional freight is obtained by means of the lower charge, the discrimination is justified both at common law and under the statutes.

The importance of this factor in the discussion is at once manifested by certain testimony given by the plaintiffs through one of their witnesses, L. E. Munson, who was the superintendent of the Bellefonte Iron & Nail Company. On examination by counsel for the plaintiff he was asked: " Q. What did you say the capacity of the nail works was as to outgoing freight? A. About thirty tons a day, thirty to forty tons a day. Q. That would be three hundred kegs, would it? A. We have a capacity of five hundred kegs. Q. What was your outgoing freight? A. I suppose part of the time we made a hundred thousand kegs a year, from seventy-five to one hundred and twenty-five thousand kegs a year. Q. Would that mean about one car a day on a three hundred kegs basis? A. Yes, sir;

then we shipped considerable muck bar.   Q. Were you ship-
ping muck bar at the time you were shipping nails?   A. Some-
times; when we were making nails out of steel rods.   Q. Were
you making muck bar at the time you were making nails?
A. Yes, sir.   Q. Were you making bar iron and shipping it
at the time you were making nails?   A.. Yes, sir."

As the foregoing testimony was given by the plaintiffs, and
was not at all contradicted by the defendant, the plaintiffs are
bound by it, and it must be taken as establishing the fact which
it develops, and the fact thus established is of the greatest pos-
sible consequence in the case.   It entirely destroys, in our
opinion, the fundamental allegation of the plaintiffs that the
shipments of coal to the plaintiffs, and the nail works, were
made " upon like conditions and under similar circumstances."
For the shipments of coal to the plaintiffs yielded but one freight
to the defendant, while the shipments to the nail works yielded
not only the same incoming freight on the coal, of at least
twenty tons a day, but an additional outgoing freight of thirty
to forty tons a day of fabrics manufactured by the nail works.
In view of this testimony how can it possibly be said that the
conditions of the two shipments are alike and their circum-
stances similar?   That a railroad company may lawfully secure
to itself so important an addition to its business by making a
lower charge to one customer than to others, is fully established
by the authorities, as we shall presently see.

(5) The manufacture and sale by the nail works of nails and
muck bar were outside of, and entirely harmless to, the business
of the plaintiffs, and hence a lower price for the coal consumed
by the nail works was neither an undue nor an unreasonable dis-
crimination against the plaintiffs, because it was an immaterial
circumstance as affecting their business.   This is self-evident.
The plaintiffs did not deal in nails or muck bar, and the sale of
those commodities by the nail company, necessarily, could have
no effect upon the plaintiffs' business, which was the selling of
coal to persons who consumed it.

(6) As to all persons who did sell coal at Bellefonte, they
were charged the same freights precisely as were charged to
the plaintiffs.   This is the undisputed testimony.

Let us now see what is the voice of the authorities upon the
subject of discriminations in freight charges by carrying com-

panies.  The subject is an old one.  Prior to any statutes in
England or in this country, the common law had pronounced
upon the rights and duties of carriers and freighters, and in
the enactment of statutes little more has been done than to em-
body in them the well known principles of the common law.
It happens, somewhat singularly, that the very question we are
now considering, of a discrimination in the rates charged to
coal dealers and to manufacturers who use coal as a fuel, does
not appear to have arisen.  And yet it is very certain that such
discrimination does prevail, and has prevailed for a long time
on all lines of railway and canal.  It is highly probable that
the absence of litigation upon such discrimination is due to the
general sentiment of its fairness and justness.  Within the
writer's knowledge in the section of the state in which he lives,
a much greater difference between the rates charged to dealers
and those charged to manufacturers by the coal carrying com-
panies has always existed and now exists, without any question
as to its justness or its legality.  It is matter of public history
that along the valleys of the Lehigh and the Schuylkill there
are great numbers of blast furnaces, rolling mills, rail mills,
foundries, machine shops and numerous other manufacturing
establishments which consume enormous quantities of the coal
output of the state, and at the same time in every village, town
and city which abound in these regions, an immensely large in-
dustry in the buying and selling of coal for domestic consump-
tion is also prosecuted.  And what is true of the eastern end
of the state is without doubt equally true throughout the in-
terior and western portions of the commonwealth, where similar
conditions prevail.  Yet from no part of our great state has
ever yet arisen a litigation which called in question the legality,
or the wisdom, or the strict justice of a discrimination favorable
to the manufacturing industries as contrasted with the coal
selling industries.  This fact can scarcely be accounted for ex-
cept upon the theory that such discrimination, as has thus far
transpired, has not been felt to be undue, or unreasonable, or
contrary to legal warrant.  In point of fact it is perfectly well
known and appreciated, that the output of freights from the
great manufacturing centres upon our lines of transportation,
constitutes one of the chief sources of the revenues which sus-
tain them financially.  Yet no part of this income is derived

from those who are mere buyers and sellers of coal. When the freight is paid upon the coal they buy, the revenue to be derived from that coal is at an end. Not so however with the revenue from the coal that is carried to the manufacturers. That coal is consumed on the premises in the creation of an endless variety of products which must be put back upon the transporting lines, enhanced in bulk and weight by the other commodities which enter into the manufactured product, and is then distributed to the various markets where they are sold. In addition to this, a manufacturing plant requires other commodities besides coal to conduct its operations, whereas a coal dealer takes nothing but his coal, and the freight derived by the carrier from the transportation of these commodities forms an important addition to its traffic, and constitutes a condition of the business which has no existence in the business of carrying coal to those who are coal dealers only. Thus a blast furnace requires great quantities of iron ore, limestone, coke, sand, machinery, lumber, fire bricks and other materials for the maintenance of its structures and the conduct of its business, none of which are necessary to a mere coal selling business. These are some of the leading considerations which establish a radical difference in the conditions and the circumstances which are necessarily incident to the two kinds of business we are considering. Another important incident which distinguishes them is that the establishment of manufacturing industries, and the conducting of their business, necessitates the employment of numbers of workmen and other persons whose services are needed, and these, with their families, create settlements and new centres of population, resulting in villages, towns, boroughs and cities, according to the extent and variety of the industries established, and all these, in turn, furnish new and additional traffic to the lines of transportation. But nothing of this kind results from the mere business of coal selling. In fact that business is one of the results of the manufacturing business and is not co-ordinate with it. The business of the coal dealer is promoted by the concentration of population which results from the establishment of manufacturing industries, and these two kinds of business are not competitive in their essential characteristics, but naturally proceed together, side by side, the coal selling increasing as the manufacturing increases in magnitude and extent.

These considerations are generic and are suggested for the purpose of illustrating the differences between the fundamental conditions and circumstances of the two industries we are considering.

Recurring now to the authorities, we find that the British statute of 17 and 18 Victoria, c. 31, 1854, is perhaps the earliest instance of direct legislation upon this subject. That statute prohibited " undue or unreasonable preference or advantage " in transportation charges, but lacked the restricting words " from the same place upon like conditions and under similar circumstances," which appear in our act of 1883. Yet it was held in the cases of Ransome, 1 C. B. N. S. 437, and Oxlade, 1 C. B. N. S. 454, that it was competent to a railway company to enter into a special agreement for the carriage of goods for a particular individual or company, at a lower rate in respect of large quantities of goods and longer distances, than for one who sends them in small quantities and shorter distances. In Ransome's case it was said by CRESWELL, J., in delivering the opinion of the court: " After a good deal of consideration we think that the fair interests of the railway ought to be taken into the account."

In the case of Nicholson v. The Great Western Railway Co., 94 E. C. L. R. 366, the same doctrine was held, and it was also held that the 2d section of the Railway Traffic Act, 17 and 18 Victoria, c. 31, was not contravened by a railway company carrying at a lower rate, in consideration of a guaranty of large quantities and full train loads at regular periods, provided the real object of the company be to obtain thereby a greater remunerative profit, by the diminished cost of carriage, although the effect may be to exclude from the lower rate those persons who cannot give such a guaranty. CROWDER, J., said, in the opinion: " When the statute speaks of ' undue and unreasonable preference or advantage,' and, ' undue or unreasonable prejudice or disadvantage,' it uses language implying that there may be advantage to one person or one class of traffic, and prejudice to another, which would not be within the act of parliament. The preference and prejudice must be ' undue ' or ' unreasonable,' to be within the statute. And although in the case now before the court it is quite manifest that the Ruabon Coal Company have many and important advantages in carrying their

coal on the Great Western Railroad, as against the complainants and other coal owners in the Forest of Dean, still the question remains, are they 'undue' or 'unreasonable' advantages? This mainly depends upon the adequacy of the consideration given in return to the railway company for the advantages afforded to the Ruabon Coal Company."

The justice then proceeds to show that it was to the advantage and profit of the railway company to carry coals for the Ruabon Company at a lower rate than for the complainants, and concludes in the language of the syllabus above quoted that this was no violation of the act. All of the foregoing cases recognize the proposition that if the interest of the railway company was subserved by charging the lower rate to the one company than to the other, the act was not violated. That conclusion was reached in a case where the complainant was in the same business with the favored company, and was injuriously affected by the discrimination, but the court held that this was permissible if the interests of the railway company were thereby subserved. With how much greater force can it be said that here, where there is no competition in the disposal of the coal of the plaintiffs and the products of the nail company, and also where the inducement to the defendant to make the lower rate for the nail company is a largely increased traffic on the defendant's road, neither the letter nor the spirit of our act of 1883 was violated.

The doctrine of the cases above cited was also declared in the case of Boxendale v. R. R., 94 E. C. L. 353, where COCK-BURN, J., said: "If an arrangement were made by a railway company whereby persons bringing a larger amount of traffic to the railway should have their goods carried on more favorable terms than those bringing a less quantity, a court might uphold such an arrangement as an ordinary incident of commercial economy, provided the same advantage were extended to all persons under the like circumstances." This latter incident would of course be essential where all of the favored class were in the same business.

In the case of Messenger v. R. R. Co., 37 N. J. L. R. 531, cited for the appellee, the court was careful to say that, "It must not be inferred that a common carrier in adjusting his price cannot regard the particular circumstances of the particular

transportation. Many considerations may properly enter into
the agreement for carriage or the establishment of rates, such
as the quantity carried, its nature, risks, the expense of car-
riage at different periods of time, and the like; but he has no
right to give an exclusive advantage or preference in that
respect to some over others for carriage in the course of his
business."

In that case there was a very clear preference to one party
over all others in the same business, by the railroad company
giving him a specific drawback upon freights on hogs carried
from the same points, and of course as this was direct preference
over all others it was in violation of the law.   But that decision
has no application to this case.

In the case Interstate Commerce Commission v. Baltimore &
Ohio Railroad Co., 145 U. S. 263, it was held that the issue by
a railway company engaged in interstate commerce, of a party
rate ticket, for the transportation of ten, or more, persons at a
rate less than that charged to a single individual for a like trans-
portation on the same trip, did not make an unjust or unrea-
sonable charge, nor an unjust discrimination, nor give an undue
or unreasonable preference or advantage to the purchasers of
the party-rate ticket, within the meaning of the several provis-
ions of the interstate commerce act of 1887.   There was much
discussion of the general subject of the prohibitions of the gen-
eral statute in the opinion of the Supreme Court of the United
States in this case, from which it will be instructive to present
some quotations.   The English traffic act of 1854, above refer-
red to, was fully considered, and the cases of Oxlade and Ran-
some and others hereinbefore cited, were recognized and followed.
Amongst other things it was said by Mr. Justice Brown, who
delivered the opinion : " It is not all discriminations or prefer-
ences that fall within the inhibition of the statute ; only such
as are unjust and unreasonable.   For instance, it would be ob-
viously unjust to charge A a greater sum than B for a single
trip from Washington to Pittsburgh; but, if A agrees not only
to go but to return by the same route, it is no injustice to B to
permit him to do so for a reduced fare, since the services are
not alike, nor the circumstances and conditions substantially
similar, as required by section 2, to make an unjust discrimina-
tion.   Indeed the possibility of just discrimination and reason-

able preferences is recognized by these sections in declaring what shall be deemed unjust. . . . In order to constitute an unjust discrimination under section 2, the carrier must charge or receive directly from one person a greater or less compensation than from another, or must accomplish the same thing indirectly by a special rate, rebate or other device ; but in either case it must be for a ' like and contemporaneous service in the transportation of a like kind of traffic under substantially similar circumstances and conditions.' To bring the present case within the words of this section, we must assume that the transportation of ten persons on a single ticket is substantially identical with the transportation of one, and, in view of the universally accepted fact that a man may buy, contract, or manufacture on a large scale cheaper proportionally than upon a small scale, this is impossible. In this connection we quote with approval from the opinion of Judge JACKSON in the court below : ' To come within the inhibition of said sections the differences must be made under like conditions ; that is, there must be contemporaneous service in the transportation of like kinds of traffic under substantially the same circumstances and conditions. . . . In short the substance of all these decisions is that railway companies are only bound to give the same terms to all persons alike under the same conditions and circumstances, and that any fact which produces an inequality of conditions and a change of circumstances justifies an inequality of charge. . . . But in so far as relates to the question of " undue preference," it may be presumed that Congress, in adopting the language of the English act, had in mind the construction given to these words by the English courts and intended to incorporate them into the statute. McDonald v. Hovey, 110 U. S. 619.' "

In the case of Fitchburg R. R. v. Gage, 12 Gray (Mass.), 393, the right to discriminate upon the basis of a carriage for a certain time and in certain quantities was declared. The claim of the shipper was for an equality of charge for shipments of ice with charges for shipments of bricks, because they were of the same class of freight, but the claim was not allowed. The court said, by way of illustration of the principle upon which there might be a lawful discrimination of rates upon the same class of goods: " If for special reasons in isolated cases

the carrier sees fit to stipulate for the carriage of goods or merchandise of any class for individuals, for a certain time, or in certain quantities, for less compensation than what is the usual, necessary and reasonable rate, he may undoubtedly do so without entitling all other persons and parties to the same advantage and relief." And this court said in the case of Shipper v. Pa. R. R. Co., 47 Pa. 338 : "We are not prepared to say that a railroad company may not discriminate in its rate of tolls in favor of domestic trade over foreign; in favor of home products over those which are extra-territorial, especially when the railroad lies wholly within the state. Ownership may not be a reasonable ground for a distinction, but weight, bulk, value, place of production and many other things may be."

These cases are cited as illustrations of various reasons and principles upon which lawful discriminations may be made, even in charges for the carriage of the same goods over the same roads and to be used for the same purposes. But in the present case where not only a particular quantity must be furnished to the railroad every day, but the goods at the point of delivery are to be used for totally different purposes which do not conflict or compete with each other, the reason for a discrimination has an infinitely greater force.

In Hutchinson on Carriers, p. 353, after a protracted review of all the cases, and they are very numerous, the writer sums up the result thus: "Mere inequality in charges does not, therefore, of itself amount to an unjust discrimination. It only becomes such when a discrimination is made in the rates charged for transportation of goods of the same class, of different shippers, under like circumstances and conditions. So a mere reduction from the established rate is not necessarily an unjust discrimination. But it becomes such when it is either intended, or has a natural tendency, to injure another shipper in his business, and destroy his trade by giving to the favored shipper a practical monopoly of the business."

We come now to consider the case of Borda v. Railroad Co., 141 Pa. 484. It was an action of case brought against the Phila. & Read. R. R. Co. by the plaintiffs, who were shippers of coal, to recover damages for alleged illegal discriminations in the freight charged to the plaintiffs on shipments of coal over the defendant's road, as against lower rates charged to other

shippers over the same road.    The case was by agreement of the parties referred to Mr. Peter McCall as referee, who made a most exhaustive and elaborate report, denying the claim of the plaintiffs, and his report was affirmed by this court.    As the shipments had been made prior to the adoption of our constitution of 1874, a preliminary question arose, whether it was the duty of the defendant to carry without discrimination.    The referee held that such was the duty of the defendant, saying, " I regard it, then, as settled law in this state, that a railroad company, a common carrier, owes a duty of equality to every citizen, and I adopt the position taken by Mr. Bullitt in argument, that railroad companies have no right to make any undue discrimination or preference in their charges; and a charge made to one shipper higher than another, for the same service, under like circumstances, constitutes undue preference and discrimination, and by consequence renders the charge unreasonable. Such is the general rule, and it is vastly important to the general public that there be no undue relaxation of this rule; for, exercising, as they practically do, a monopoly of transportation on their roads, railway managers have in their hands a tremendous power, by discrimination, to enrich one man and ruin another. The equality however, which is thus prescribed, is not a strict and literal equality under all circumstances, however varying and different.    It is rather an equality in the sense of freedom from unreasonable discrimination.    It is only unjust, undue, or unreasonable discrimination, against which the law has set its canon.    Arbitrary discrimination is illegal; so discrimination made with a view of giving advantage to one person.    But the truism that circumstances alter cases applies here, and, under a different state of circumstances, a discrimination may be reasonable and lawful, which, were the circumstances the same, would be undue and unreasonable.    In order to render lawful an inequality of charge, the goods must be carried under different circumstances, and the question whether the difference is material or essential arises in each particular case."

The writer regards the foregoing as the most precise and the most felicitous expression of the law upon the general subject under consideration that he has met with, and therefore quotes it entire.

The claim of the plaintiffs was to recover damages to the

amount of upwards of $60,000 for unjust discrimination in favor of Audenried & Co., rival coal shippers to the plaintiffs, by the payment to Audenried & Co. of rebates on coal shipped from Port Richmond to points beyond New Brunswick at the rate of $1.65 for steamer coal, and other rates for other grades. It was proved that these rebates were paid under agreements between Audenried & Co. and the defendant, made at the beginning of the season, and to continue throughout the season, and the referee was of opinion, and so found, that these contracts for continuous shipments during the whole season at fixed rates, constituted such a difference in the conditions and circumstances of the shipments for Audenried & Co. and the plaintiffs respectively, as to justify the discrimination and prevent it from being illegal. In expressing his conclusions the referee says : " The defendant's case denies that the discrimination was willful, and made with any such design as imputed by the plaintiffs. It rests upon the ground that the payment of the drawbacks to Audenried & Co., under an honest and bona fide belief that they were entitled to them, under an arrangement by which, in consideration of their having made contracts early in the spring for delivery of coal at fixed prices throughout the season, they were allowed the drawbacks in question. . . . On the whole, I am of opinion, upon the best consideration I have been able to give the subject, that the defendants did not pay to Audenried & Co. the drawbacks complained of in the first and additional count of the declaration, willfully and with intent to enable them to increase their business at the expense of the plaintiffs, but that it paid the same in good faith under the belief that Audenried & Co. had made contracts in the spring at a fixed price for the delivery of the coal. . . . I am of opinion therefore that the defendant could legally have allowed the drawbacks to Audenried & Co., which it did allow, if that firm had had contracts made in the early part of the season for delivery of coal in the eastern market at fixed prices. In that case, although the service rendered, to wit, the transportation, would have been the same as that rendered to the plaintiffs, yet the circumstances were different, and the difference of circumstances would have justified the discrimination."

While this court did not review the testimony taken before

the referee, because it was not before us, we affirmed the judgment in favor of the defendant, upon the report, conceding the facts to be as found by the referee.

It will be perceived therefore that in that case the circumstance, that the coal was shipped for Audenried & Co. under contracts made at the beginning of the season at fixed prices, and to continue throughout the season, was held a sufficient reply to a charge of unjust discrimination, although the commodity shipped was the same, to wit, anthracite coal, and the shipments were between the same points, to wit, from Port Richmond to points east of New Brunswick, and the plaintiffs were engaged in the same business as Audenried & Co.

Whereas, here, the plaintiffs were not engaged in the same business as the Bellefonte nail company, there could not be any competition between them in the products sold, and the rate at which coal was carried for the nail company was a matter of absolute indifference to the plaintiffs. We repeat again that we do not regard the sales of coal by the nail company to its own employees as of any moment in the case: (1) Because there is no proof that they were made with the knowledge of the defendant, but there is positive and uncontradicted proof that they were made without such knowledge. (2) Because the defendant is not responsible for such sales by the nail company. (3) Because the coal carried by the defendant for the nail company was not carried for purposes of sale at retail, but for the purpose of manufacturing nails and muck bar. (4) Because there is no proof that the plaintiffs sustained any damage by reason of the sales of the nail company to their employees.

But it must be understood, and we so decide, that a manufacturing company has no right to engage in the business of selling coal, even to its own employees, and if it does so, and the transporting company is notified of such selling, it must thereupon cease to carry coal to the manufacturing company at any less rate than it charges to the coal dealers, or incur the penalties of unjust discrimination.

The ruling of the court below would require that coal carried to blast furnaces, rolling mills, rail mills, foundries and all other manufacturing enterprises should be carried for the same price as the coal carried to any retail dealer in the same locality, though the quantity consumed by the former might

extend to many thousands of tons each year, while the quantity carried for the latter might be a few hundred tons only, and although the manufacturing companies gave back to the carrier many thousands of tons of freight each year, while the retail dealer gave back none, and although the business of the manufacturer in no wise competes with the business of the dealer. We think the differences in these respects between these two kinds of business are such as to justify a discrimination in the rates of freight charged to each, and the conditions of the two are not alike and their circumstances are not similar within the meaning of our act of 1883, and therefore there can be no recovery in this case.

The fact that the payment of the rebates was not known to the plaintiffs is of no possible consequence, both because they had no right to know it under our present ruling that the circumstances were not similar and the conditions not alike, and also because if the discriminating charge was lawful, the absence of notice to the plaintiffs would not make it unlawful. The same point was made and ruled in the Borda case. The referee said: "But in point of law I do not think that the duty of giving notice to the world of every special rate rests upon the carrier under penalty of being guilty of unlawful discrimination by his omission to give such notice. How and to whom is such notice to be given?

It remains only to be added that differences of freight rates on coal to manufacturers and to mere dealers are, and have been for many years, in universal practice, and not a single case other than this has as yet reached the courts of last resort in England or in the United States, questioning the entire legality and propriety of such differences, and that circumstance is ample proof that both the professional and the lay mind has assented to the practice.

Speaking upon a similar subject, the difference in passenger rates upon ordinary tickets, and thousand mile tickets, or go and return tickets, the Supreme Court of the United States, in the case of Interstate Com. Coms. v. B. & O. R. R. Co., 145 U. S. 263, said: " In view of the fact however that every railway company issues such tickets; that there is no reported case, state or federal, wherein their legality has been questioned; that there is no such case in England; and that the

practice is universally acquiesced in by the public, it would seem that the issuing of such tickets should not be held an unjust discrimination, or an unreasonable preference to the persons traveling upon them."

On the question of damages the court below charged the jury : " If the nail works paid twenty cents less freight per ton on their coal they had that much of an advantage over others ; and the law would seem in the mind of the court to fix that excess as the measure of the plaintiffs' damages."

We think this was serious error.   The act of 1883 contains no language justifying an instruction that the party injured can recover three times the amount of the difference in the rates charged.   The words of the act are, " any violation of this provision shall make the offending company or common carrier liable to the party injured for damages treble the amount of injury suffered."   The " amount of injury suffered " is the measure of the single damages to be allowed.   But it does not at all follow that the amount of injury suffered is the difference in the rates charged.   It might be, or it might not be, but, in any event, it must be a subject of proof, and there was no proof in the case of the actual damage sustained.   How does it follow that because the defendant company paid in 1889 to the nail company a rebate of some $6,000 on all the shipments that had been made from 1881 and a few sums thereafter, the plaintiffs suffered damage to any extent ?   In point of fact the nail company paid the full freight of fifty cents a ton net during all these years, and their claim for rebates was not adjusted until 1889. How then does it appear that damage was suffered by the plaintiffs in consequence of the payment of the rebates to the nail company ?   It does not appear that the plaintiffs sold their coal for any less than the current market price at any time except when they and the other dealers were engaged in a war of prices and sold it far below the actual cost, in a struggle to capture the market.   And it does not appear but that the plaintiffs would have sold their coal at twenty cents less than they did, if they had received the rebate.   The natural inference is that that is precisely what they would have done in the contest for the market.   But of all this there is not a word of testimony, and yet it is only actual damage that they can recover.   The proof for the defendant was that they never cut the market price to their men, but maintained it even when the coal deal-

ers of the town were slaughtering each other's trade by selling below cost. As three times the actual damage is the penalty the defendant would have to pay if the judgment were sustained, they have a right to require very clear and definite proof as to what the actual damage was.

When blast furnaces and great iron mills are built, they are not placed in cities or towns, but in the open country, where land is abundant and cheap, and of course on the line of a railroad. When they are established there is no population at the place of erection. The railroad companies are very willing to make as favorable terms as possible for freights on all the materials that are brought to the plants and on all products that are carried from them, because they get a largely increased business from such enterprises. When the works are erected houses are built for the men and officials of the companies. After that come the usual accessories required to supply the wants of the population, to wit, merchants, tradesmen, mechanics, butchers, bakers, grocers, and, amongst others, coal dealers. But the moment the last of these arrive, if the principles which prevailed in the court below in this case are correct, the whole freight system agreed upon between the transporter and the manufacturer theretofore must be changed and advanced to the freight rates charged to the retail dealers, or else all the rates charged to such dealers must be lowered to conform to the rates charged to the manufacturer. If this is not done the manufacturer incurs the risk of being visited years afterwards with claims for treble damages, which may embrace any period of six years, and as all the dealers have the same right of action in this regard that any one of them has, and every town or city along the line has some or many retail coal dealers and manufacturing establishments also within its limits, it is easy to see that the aggregate of such claims may soon absorb the entire property and assets of the strongest transporting companies of the state. We do not find anything in the law that renders necessary, or possible, any such results as these, and we think it wiser and better to administer the law so that the rights and interests of all may be conserved within rational and sensible limits.

We sustain the first, second, third and fifth assignments of error. The fourth and sixth assignments have no merit and are not sustained.

Judgment reversed.