CASE 88—INDICTMENT FOR UNJUST DISCRIMINATION IN RATES—
JUNE 7.

# Louisville & Nashville R. R. Co. v. Commonwealth.

### APPEAL FROM MARION CIRCUIT COURT—FOUR CASES.

THE LOUISVILLE & NASHVILLE RAILROAD COMPANY WAS INDICTED AND
CONVICTED OF THE OFFENSE OF UNJUST DISCRIMINATION IN RATES,
AND IT APPEALS. REVERSED.

CARRIERS—UNJUST DISCRIMINATION IN RATES—METHOD OF INSTI-
TUTING PROSECUTION.

Held: 1. The Constitution, section 217, providing that the attorney
general shall institute proceedings to enforce the provisions of
Id. section 215, prohibiting common carriers from making a
discrimination in rates where the conditions are the same, does
not exempt a carrier from indictment for a violation of those
provisions.

2. Even if an indictment for a violation of section 215 of the Con-
stitution can be made only upon recommendation of the board
of railroad commissioners, as provided by the Kentucky Statutes,
section 819 (a question not decided), the objection that there
was no such recommendation was waived where no motion was
made to dismiss the indictment upon that ground.

3. An indictment for unjust discrimination in rates should set out
the points from and to which the goods were shipped.

4. Under the Constitution, section 215, providing that all railroad
companies shall haul "freight of the same class for all persons,
associations or corporations from and to the same points and
upon the same conditions, in the same manner and for the
same charges, and for the same method of payment," a rail-
road company may charge less for hauling coal used for man-
ufacturing purposes than it charges for hauling coal used for do-
mestic purposes, as the fact that the company receives the
manufactured product for return shipment in the one case and
not in the other constitutes a difference in conditions which au-
thorizes a difference in charges.

JUDGES PAYNTER, WHITE AND GUFFY DISSENTING.

Louisville & Nashville R. R. Co. v. Commonwealth.

WALKER D. HINES, Attorney for appellant.

H. W: BRUCE and E. W. HINES of counsel.

1. Section 215 of the Constitution does not apply where the freight is of different classes or transported upon different conditions. L. & N. R. R. Co. v. Com., 20 Ky. Law Rep., 1099.

2. The coal for domestic purposes and the coal for manufacturing purposes are in fact in distinct classes, although nominally in the same class, and their transportation is upon different conditions.

3. The difference in substantial classification is justified by the difference in the conditions of transportation, which are eminently proper considerations, and the resulting difference in rates is perfectly just and reasonable, and not injurious to any person.

4. The authorities recognize the applicability of such considerations, and are uniform to the effect that discriminations based upon them are not unjust or unlawful, either at common law or under statutory provisions similar to section 215 of the Constitution. U. P. R'y. Co. v. Goodridge, 149 U. S., 680; Scofield v. Railway Co., 43 Ohio St., 571; Ragan v. Aiken, 9 Lea, 609; Sanford v. Railroad, 24 Penn. St., 378; Messenger v. Penn. R'd., 36 N. J. L., 407; McDuffie v. Portland, &c., R. Co., 52 N. H., 430; A. T. & S. F. R. Co. v. D. & N. O. R'd., 100 U. S., 667; Interstate Com. Com. v. B. & O. R. Co., 43 Fed. Rep., 37; Interstate Com. Com. v. B. & O. R. Co., 145 U. S., 263; T. & P. R'y. Co. v. InterstateCom. Com., 162 U. S., 197; Interstate Com. Com. v. L. & N. R. Co., 73 Fed. Rep., 409; Western Union Tel. Co. v. Call Publishing Co., 43 Neb., 320; (s. c., 62 N. W., 506).

5. The only reported case involving the property of such a discrimination between coal used for domestic purposes and that used for manufacturing purposes, emphatically and unanswerably upholds the lawfulness of the discrimination under a law at least as stringent as section 215 of the Constitution. Hoover v. P. R'd. Co., 156 Pa. St., 220; (s. c., 27 Atl., 282).

6. If section 215 of the Constitution be so construed as to prohibit absolutely and arbitrarily just and proper discrimination, then it works an arbitrary and unreasonable interference with the right of the railroad company to conduct its business in a legitimate manner, without injury to any portion of the public, and so construed would deprive the company of its property without due process of law, and deny to it the equal protection of the law, and impair the obligation of the company's charter contract.

7. Section 215 of the Constitution can be violated only where dif-

ferent charges are made for the transportation of different freight of the same class, and upon the same conditions, *from the same point of shipment to the same point of destination*, and the court erred in allowing the jury to consider shipments from different points of shipment, although the same point of destination.

8. The entire proceedings are unwarranted because the indictments were not found on the request and recommendation of the railroad commission, and not found at the instance of the Attorney General, but were found by the grand jury simply on their own motion.

9. In one of the cases the indictment shows on its face that the alleged offense was not committed more than twelve months before the finding of the indictment and fails entirely to show that the prosecution was continuous and is therefore defective. Tully v. Com., 13 Bush, 153; N. N & M. V. Co., v. Com., 14 Ky. Law Rep., 197 Com. v. T. J., Megibbin & Co., 19 Ky. Law Rep., 291; Com. v. The G. W. Taylor Co., 19 Ky. Law Rep., 1334.

10. In two more of the cases the indictments show that the alleged offenses were committed for more than twelve months, and the allegations that the indictments are continuous, are of no avail, because no attempt was made to prove such allegations.

11. Under the circumstances there was no warrant for quashing the former indictments and resubmitting to the grand jury. Criminal Code, secs. 273-170 and 169.

12. All four of the indictments fail in many particulars to allege facts, sufficient to constitute a public offense, and fail notably to allege the amounts of compensation or the amounts of coal transported, although these were essential averments. L. & N. R. R. Co. v. Com., 20 Ky. Law Rep., 1099.

13. The Court erred in permitting A. Van Cleve to testify about not getting manufacturers' rate.

14. The court erred in rejecting the opinion of the railroad commission of Kentucky, holding such discriminations to be just and proper, which opinion was offered in evidence as bearing on the question whether the appellant had willfully violated the law. Louisville Tob. Warehouse Co. v. Com., 20 Ky. Law Rep., 1047.

H. W. RIVES AND W. H. SWEENEY FOR APPELLEES.

1. These indictments are not barred by limitation, because the record shows they are a continuation of former indictments that had been quashed and re-referred.

2. The Kentucky Statutes, under which these indictments was found, is not in conflict with the Federal Constitution.

Louisville & Nashville R. R. Co. v. Commonwealth.

3. The verdict in each case is fully sustained by the evidence and is not contrary to the law and should not be disturbed. Kentucky Constitution, secs. 215, 217, 210, 213, 214, and 218; 20 Ky. Law Rep., 1099; Constitution United States, sub-sec. 1, sec. 10, art. 14; Criminal Code, secs. 159, 160 and 162; Com. v. Megibbin, 19 Ky. Law Rep., 291; Powell v. Pennsylvania, 127 U. S., 678; Mugler v. Kansas, 123, U. S., 663; The License Cases, 46 U. S., 504; Munn v. Illinois, 94 U. S., 113; L. & N., R. R. Co. v. Com., 161 U. S., 693; Chicago L. Ins. Co., v. Needles, 113 U. S., 574; Long & Short Haul Cases, opinion rendered May 20, 1899; Union Pacific R. R. Co. v. Goodrich, 149 U. S., 680.

T. L. EDELEN, ATTORNEY FOR APPELLEE.

Section 214 of the Kentucky Constitution, read in connection with sections 215 and 217, forbid carriers to make any preferential contract in favor of one shipper as against another, whether the words "upon the same conditions" in section 215 be construed as a limitation upon the word "persons" or not.

OPINION OF THE MAJORITY OF THE COURT BY CHIEF JUSTICE HAZEL-RIGG, FOLLOWED BY DISSENTING OPINION OF JUDGE PAYNTER, IN WHICH JUDGE WHITE AND JUDGE GUFFY CONCUR.

These appeals involve particularly the construction of section 215 of the Constitution and of sections 817, 818, and 819 of the Kentucky Statutes.    Incidentally other sections of the Constitution and the Statutes will be noticed so far as they are supposed to affect the particular sections named.    The constitutional provision is as follows: "Sec. 215.    All railway, transfer, belt lines or railway bridge companies shall receive, load, unload, transport, haul, deliver and handle freight of the same class for all persons, associations or corporations from and to the same points and upon the same conditions, in the same manner and for the same charges, and for the same method of payment."    The statutory sections are as follows:    "Sec. 817. If any corporation engaged in operating a railroad in this State shall, directly or indirectly, by any special rate, rebate, drawback or other device, charge, demand, collect or receive from any person a greater or less compensation

for any service rendered in the transportation of passengers or property than it charges, demands, collects or receives from any other person for doing for him a like and contemporaneous service in the transportation of a like kind of traffic, it shall be deemed guilty of unjust discrimination." Section 818 makes it "unlawful for any corporation to make or give any undue or unreasonable preference or advantage to any particular person or locality, or any particular description of traffic, in any respect whatever, in the transportation of a like kind of traffic," etc. Section 819 reads thus: "Any railroad corporation that shall be guilty of extortion or unjust discrimination, or of giving to any person or locality, or to any description of traffic, an undue or unreasonable preference or advantage, shall upon conviction, be fined," etc. "The circuit court of any county into or through which the line or railroad may run, be owned or operated by the corporation alleged to be guilty as aforesaid, and the Franklin Circuit Court, shall have jurisdiction of the offense, which shall be prosecuted by indictment, or by action in the name of the Commonwealth, upon information filed by the board of railroad commissioners," etc. "Indictments under this section shall be made only upon the recommendation or request of the railroad commission filed in the court having jurisdiction of the offense; and all prosecutions and actions under the law shall be commenced within two years," etc. As the manner of instituting prosecutions for violation of the constitutional provisions and the statutes on the subject involved is a matter in dispute here, we quote section 217 of the Constitution, which is as follows: "Sec. 217. Any person, association or corporation willfully or knowingly violating any of the provision of sections two hundred and thirteen, two

Louisville & Nashville R. R. Co. v. Commonwealth.

hundred and fourteen, two hundred and fifteen or two hundred and sixteen, shall upon conviction by a court of competent jurisdiction, for the first offense be fined two thousand dollars; for the second offense five thousand dollars, and for the third offense, shall therefore, *ipso facto,* forfeit his franchises, privileges or charter rights; and if such delinquent be a foreign corporation it shall, *ipso facto,* forfeit its right to do business in this State; and the attorney general of the Commonwealth shall forthwith upon notice of the violation of any of said provisions, institute proceedings to enforce the provisions of the aforesaid sections." Section 213 requires railroad companies to receive and handle loaded and empty cars and freight in car loads, etc., coming from other companies without discrimination or preference, etc. Section 214 was designed to compel the carrier to perform the service of receiving, transporting, and handling freight without exclusive or preferential contract or arrangement, and secures equality of service, leaving the succeeding section to secure equality of charges.

A preliminary question is raised by appellant growing out of the provision of section 217, to the effect that the attorney general of the Commonwealth shall forthwith, upon notice of the violation of any of the provisions of sectins 213-216 institute proceedings to enforce such provisions. These prosecutions are by indictment, and it does not appear that they were set on foot by the Attorney General; hence it is claimed by the appellant company the prosecutions can not be maintained. We do not think the contention tenable. The well-known and usual mode of inflicting punishment for a violation of the penal laws of the State is by a trial of the offender under an indictment, and, if the radical change claimed had been intended, we

think plainer language would have been used. The language is not that the Attorney General shall institute prosecutions for the enforcement of the penalties fixed for a violation of these sections, but that officer was to institute proceedings to enforce the provisions of the sections. It will be noticed that there are certain positive dutes enjoined on the common carrier in which the public is vitally interested, and these, we do not doubt, the Attorney General might require to be performed at the suit of the State. To punish by a criminal prosecution for a violation of law is one thing, and to institute proceedings to enforce the performance of duty is another. It is true, the punishment may induce the performance, but not necessarily. What the public wants at the hands of the carrier is performance of those important duties. It cares nothing for fines, except, indeed, as their infliction mav possibly induce performance. The language, strictly followed, only purports to look to the enforcement of the provisions of these sections by the institution of proceedings by the Attorney General, and not necessarily to the prosecution of the offender. Again, it is urged by appellant that, as the Constitution does not provide in what particular way—if we hold it does not so provide—such prosecution shall be inaugurated, the matter was intended to be left to the Legislature; and that it has declared that indictments for violation of the provisions of these sections shall be made only on the recommendation of the railroad commission, filed in the court having jurisdiction of the offense. And, as the record does not disclose such recommendation, there can be no prosecution. It would seem clear that the Legislature has attempted to confide the inauguration of such prosecutions to this board. There seems, however, to have been no motion made to dismiss the prosecution based on

the ground mentioned, and it is too late to make the question here for the first time.

Nor do we decide or intimate that such prosecutions must be inaugurated by this board. The question is not before us. These preliminary questions aside, we come to the vital questions involved. The indictments, as already foreshadowed, charge the appellant with "unjust discrimination," and it is averred with some particularity how it did so. In substance, it is charged in indictment No. 519—the others differing only in names and amounts of rebate—that the carrier, after having received from the Lebanon Roller Mills the same rate of compensation for the transportation of coal to Lebanon Ky., as it had unlawfully, willfully, and knowingly received from J. M. Shreve for the contemporaneous transportation of coal of a like amount, and of the same kind or class of traffic, in the same manner, and upon the same conditions, for the same distance, over the same line, in the same direction, and for the same method of payment, did willfully and knowingly refund and pay to the Lebanon Roller Mills a rebate of $11.88 in pursuance of an agreement so to do in advance, and did fail and refuse to refund to J. M. Shreve any portion of the amount so collected for him as aforesaid, thereby willfully and knowingly charging and receiving from the Lebanon Roller Mills a less compensation for a service rendered in the transportation of coal to Lebanon, Ky., than it charged and received from J. M. Shreve for a like and contemporaneous service in the transportation of a like kind of traffic. Contrary, etc., the form, etc. There are probably some minor defects in these indictments. For example, the points from and to which the coal is alleged to have been transported ought to be set out, so that the carrier may know how to meet the accusation,

and with respect to what shipments it is to prepare its proof. It is also noticeable that the qualifying phrases "of a like amount, and of the same kind or class of traffic, in the same manner, and upon the same conditions, for the same distance, over the same line, in the same direction, and for the same method of payment," are so grouped as to leave the construction of the sentence somewhat confused, and the meaning obscure. The effect of this we may notice later on. We shall assume that the averments of the indictments are sufficient to constitute the offense denounced by the Constitution. The facts developed on the trial are not in dispute; and, using the same indictment we have already referred to as illustrating the facts of all of them, it appears that the Lebanon Roller-Mills Company was engaged in the business of manufacturing flour and meal at Lebanon, Ky., on the line of the carrier's road. The capacity of the plant was about 300 or 400 barrels per day, and its company shipped out and over appellant's road about two-thirds of the output of the mill. The company bought the coal it used for generating steam at the 'Eastern Kentucky mines,—Jellico, Middlesboro, Pittsburg, East Bernstadt, etc. This coal was shipped over the appellant road to Lebanon at the same rates which were published and announced for all buyers of coal by the appellant in the usual public way; but for all coal it used for steam purposes it got a rebate of 30 per cent., and this rate was also announced publicly on the tariff sheets of appellant, and was well known. The various coals used for steam purposes were known as "slack," "pea coal," "nut coal," sometimes "run of mines,"—unscreened coals,—and were inferior grades of coal. Shreve was a coal dealer, and sold that commodity for domestic use only. He used lump coal, and sometimes clean nut,

Louisville & Nashville R. R. Co. v. Commonwealth.

grades demanded for domestic use, and which were higher grades than those used for steam purposes. The proof does not show that he ever used, or that his trade demanded, the steam coals, but it is admitted that, had he done so, he would not have been entitled to any rebate. Moreover, while the proof does not show that the manufacturing establishments in question in fact used other than the lower grades of coal, it is admitted that occasionally similar establishments did so, as it was not always possible to get the lower grades, or the higher grades might be desired for some special reason or occasion. In such exceptional event it is admitted the manufacturer would get the rebate. It was further shown that the demand for coal by the manufacturer was much more regular throughout the year than the demand by the domestic dealer. Upon these conditions being shown, it is the contention of appellant that there has been no violation of the law, because the freight shipments in question made to the Lebanon Roller-Mills Company and to Shreve, respectively, do not constitute an unjust discrimination, and were not made "upon the same conditions," within the meaning of the Constitution.

There are several grounds on which the appellant rests its right to impose the discriminating rates in question. In the first place, it is claimed the classification adopted by the company, while formally otherwise, is substantially and practically a classification based on the quality and grades of the coal. Whatever may be the formal test applied to decide the rate applicable at the localities in question, the rule is that the manufacturer used the lower grades and the dealer the higher grades of coal. Whenever it happened otherwise, it was exceptional, and the carrier, it is contended, was authorized to maintain a rate

based on the ordinary and usual course of trade, unaffected
by rare and exceptional occurrences. In the second place,
it is claimed that the carrier may charge a lower rate of
freight for coal transported to a manufacturing establish-
ment, from which it eventually and inevitably obtains
manufactured products for additional transportation, than
to a coal dealer not in competition with the manufacturer,
and whose business with the carrier is limited merely to
the coal transported; that in such case there is no equality
or conditions, or sameness of conditions, which will justify
the coal dealer in demanding the rate which is given the
manufacturer; that the manufacturer's coal is consumed
on the premises in the creation of products which must be
put back on the transporting line, enhanced in bulk and
value, etc., by other commodities which enter into the man-
ufactured product, and is then hauled to the markets.
Moreover, a manufacturing plant requires other commodi-
ties besides coal—such as grain in this instance—to con-
duct its operations, while the coal dealer takes nothing but
his coal; and that the freight derived by the carrier from
the transporation of these commodities forms an important
addition to its traffic, and constitutes a condition of busi-
ness which has no existence in the business of carrying
coal to those who are local dealers merely. In consider-
ing these grounds, while we have stated them separately,
it is, of course, apparent that each and every element that
enters into the business of transportation has to be taken
into the account, and the result as a whole is to be con-
sidered in determining whether the conditions of particular
transportations are the same, or are substantially the
same. We say substantially, because it will not be con-
tended that the conditions must be precisely the same.
That could rarely happen. The application of the section

is not to be denied merely because the conditions surround-
ing the shipment are not entirely the same. There must,
on the whole, be a reasonable, just, and appreciable differ-
ence in the conditions before there can be allowed a differ-
ence in rate. There must be a difference in the conditions
that addresses itself to the intelligence and business com-
mon sense of the public, and those to whom, as triors un-
der the law, such questions are to be determined. Such a
difference, we believe, has been shown to exist in these
cases. While it was understood and announced that steam
coal was hauled at 30 per cent. less than other coals,
yet, as the former was almost invariably an unscreened
and lower grade of coal, and therefore of less value, the
formal classification into "steam coal" and "domestic coal"
was practically a classification into screened and unscreen-
ed coals. The proof makes this abundantly clear, and this
is in accordance with common knowledge. In its sub-
stance, and for practical purposes, the proof brings the
case within the principles announced in Louisville & N.
R. Co. v. Com. (Ky.) 48 S. W. 416, where Chief Justice
Lewis, speaking for the court, said: "For that it is allow-
able and proper for a railroad company to classify freight
according to its quality or character and marketable value,
and discriminate in charges for carrying different classes
or kinds, is not only universally recognized, but plainly
authorized by section 215." However, the plan of the car-
rier for fixing and maintaining its coal rates as developed
in these cases looks to a discrimination in rates growing
out of its peculiar business relations to and connection
with the manufacturer as such, and we therefore pass
to a consideration of the reasons for such discrimination
already briefly set out above. It is certainly true, as
contended by appellant, that from and by reason of the

transportation of the manufacturer's coal, and as a neces-
sary consequence, there are products manufactured, which,
coming again to the carrier, secure additional business for
the road. It is known in advance, and without the form
of an agreement, that these results will follow such ship-
ments of coal to the manufacturer, and that a return
trip, so to speak, will be secured over the carrier's road.
Looking at the transaction as a whole, is there any differ-
ence in principle between it, and the ordinary transaction
of a sale by a carrier of a return ticket to a passenger at
a reduced rate? The steam coal starts from the mines
to the manufacturer in one form, and the use to which it
is put creates other commodities, which the carrier picks
up as a result of the shipment in the first instance. Know-
ing all this in advance, the carrier, on business principles,
encourages the first shipment, and advertises and arranges
its rates accordingly. The case of Hoover v. Railroad (Pa.
Sup.) 27 Atl. 282, is precisely in point. The court, in an
elaborate opinion, said among other things: "The plain-
tiffs were dealers in coal merely, while the nail company
was a manufacturer of fabrics, and itself consumed the
coal it received. They were, therefore, not competitors
in the same business; and a lower rate to the manufacturer
would not, under the contract, affect the business of the
plaintiffs injuriously. . . . The business of the plain-
tiffs paid but one freight to the defendant, while the busi-
ness of the nail company paid not only the freight, to
wit, for hauling the coal to the nail works, but also, in ad-
dition to that, another and entirely independent freight
to the defendant on all the products manufactured by the
nail company. . . . The authorities are very clear and
strong that, where an additional freight is obtained by
means of the lower charge, the discrimination is justified

both at common law and the statutes.   . . .   That a railroad company may lawfully secure to itself so important an addition to its business by making a lower charge to one customer than to others is fully established by the authorities, as we shall presently see." And the court proceeded to review the authorities fully, and sustained the discriminating rate in favor of the manufacturer. In Interstate Commerce Comission v. Baltimore & O. R. Co., 145 U. S. 276, 12 Sup. Ct. 848, 36 L. Ed. 703, the supreme court had under consideration the legality of sale of party ticket rates at a reduced fare, and held their issual not to be an unjust discrimination, or an undue or unreasonable preference or advantage. In the course of that opinion, Mr. Justice Brewer, for the court, said: "It is not all discrimination or preferences that fall within the inhibition of the statute [interstate commerce act]; only such as are unjust or unreasonable. For instance, it would be obviously unjust to charge A. a greater sum than B. for a single trip from Washington to Pittsburg; but if A. agrees not only to go, but to return by the same route, it is no injustice to B. to permit him to do so for a reduced fare, since the services are not alike, nor the circumstances and conditions substantially similar, as required by section 2 to make an unjust discrimination." It is said, however, that there are certain qualifying words not found in our Constitution, but found in the Pennsylvania Constitution considered in Hoover v. Railroad Co., *supra*, and also certain qualifying words in the interstate commerce act, and in the numerous authorities cited in these cases, showing that the services of the carrier were to be "like" services, or be free from "unjust discrimination," or "undue or unreasonable preference." This is true.

Louisville & Nashville R. R. Co. v. Commonwealth.

For example, in the Pennsylvania law the carrier was prohibited from charging any person for the transportation of property a greater sum than it charged any other person "for like service from the same place, upon like conditions, and under similar circumstances." This is the purport of every law on the subject involved to which our attention has been called, and enactments of this character are found in perhaps every State in the Union. The purpose of all these are the same. Our own statute only prohibits different or discriminating charges "for a like contemporaneous service." Our Constitution does not use these particular words, but uses the broader and more comprehensive expression, "upon the same conditions." These words must be taken as descriptive of the character of service the carrier performs in making its shipments, and have reference to the conditions which affect the freight transported, considered in its relations to both shipper and carrier. If the conditions under which any given shipments are made are not the same, or substantially the same, is there any just reason why the charges therefor must be or should be the same? If, for example, the cost is less for making a shipment of coal to A. in the month of July than it is in making one to B. in the month of August in any given year, should the freight charges on the two shipments be the same, because all railways must haul freight of the same class for all persons from and to the same points in the same manner, and for the same charges, and for the same method of payment? Nowhere in the words of our law can we find authority for saying that shipments of freight not contemporaneously made, or made at a different cost, are not embraced in the requirement that they are to be hauled in the same manner, and for the same charges, and for the same meth-

od of payment, except in the qualifying words, "upon the same conditions." Without these words, the law is an arbitrary and rigid rule, and unlike any of the numerous laws in any of the States of the Union on the same subject. Except these words "upon the same conditions" be taken as an adjective phrase looking to or indicating the conditions surrounding the shipment, the law becomes an arbitrary, unyielding enactment, and different rates could not be charged for freight of the same class when shipped in car-load lots and when shipped in less than car-load lots,—a thing expressly authorized under our statutes. We think the legislative construction of the Constitution was the true construction, and that the same charges were to be collected for services in transportation when they were "like and contemporaneous services," being in such case performed under the same or similar "conditions." If, in the bill of lading for the coal in controversy, appellant had inserted the stipulation that the coal was carried at the reduced rate upon the condition that it was to be used for steam purposes, in manufacturing, then admittedly this coal would not have been carried on the same conditions as the coal hauled for domestic purposes; yet this is in substance what appellant did, as the reduced rate was not allowed until written evidence to this effect was given. The case does not, therefore, fall within the letter of the section. But, although the case is not within the letter of the Constitution, the question remains, is it within its fair purpose and spirit? The provision is highly penal, and it is a familiar rule that such provisions are not to be extended by construction to cases not fairly within their purview; for otherwise the innocent may fall into punishment. The common law required common carriers to serve all alike. In aid of this rule of the common

law, the English railway and canal traffic act was passed
in 1854, to forbid and punish discrimination. This was
followed by the interstate commerce act by the United
States, and similar statutes and constitutional provisions
by many of the several States. The thing aimed at in
all these statutes is the prevention of unjust discrimina-
tion. In the same line is section 196 of our Constitution:
"Transportation of freight and passengers by railroad,
steamboat or other common carrier shall be so regulated
by general law as to prevent unjust discrimination." Also
section 214: "No railway . . . company shall make
any exclusive or preferential contract or arrangement
. . . for the conduct of any business as a common car-
rier:" Section 215 is a part of the scheme covered by sec-
tions 196 and 214. It requires all railroads to transport
in the same manner, for the same charges, and for the same
method of payment of freight of the same class for all
persons from and to the same points and upon the same
conditions. The purpose was to secure equality between
shippers, and prevent injustice or unjust discrimination.
It can not be maintained that the convention contemplated
that there should be no discrimination, for it was notorious
then there were many discriminations not regarded as
unlawful, and section 194 expressly recognizes that such
discriminations as are not unjust may be made. All ship-
pers of coal were placed on equality by appellant, and
all were alike allowed to ship at the reduced rate coal for
steam purposes. There was nothing unreasonable in this,
as not only an inferior quality of coal was thus used, but
without it manufacturers in the interior towns in the
State would be placed in hopeless competition with those
having water transportation, and the operators of mines
in this State would also be at a great disadvantage, for

their competitors in the adjoining States (in some cases very near by) could get the reduced rate under the interstate commerce act. It can not be believed that the constitutional convention intended such a result, or that, if they had contemplated it, they would have expressed their conclusions in such terms as they employed.

It is still further suggested that, without ignoring the grammatical construction of the section, and by regarding the clauses "of the same class," "from and to the same points," and "upon the same conditions" as adjective phrases qualifying the noun "freight," still the conditions meant by the section are those which immediately and actually pertain and attach to the freight,—that is the physical status and surroundings; and subsequent conditions, such as its contemplated use, can not be taken into the account. This is clearly a more reasonable view of the section than the one which requires nothing to be established to fix the offender's guilt than that the freight shall be of the same class, and is shipped from and to the same points. But when we attempt to apply it as a fixed rule, we find it at once inadequate. Thus, obviously, the material conditions immediately attaching to any shipment of freight are those of quality and quantity. As the law expressly provides as to the quality or class, we need not give this element further attention. Two consignments of freight are tendered the carrier. One of them is for the hauling of 1,000 bushels of coal from Pittsburg to Lebanon; the other is for the hauling of 10,000 bushels from and to the same points. Now, if the quantity of the shipment is to be a controlling factor,—as it must under this construction,—then the carrier may haul for the large dealer or manufacturer at a less rate than for the small dealer or manufacturer, and this is an evil not at all to

be tolerated under any construction. The larger concern would inevitably crush out its smaller competitors. The advocates of this latter construction therefore must deny its application for the reason that the contemplated use of the freight by competitors in business is a proper subject of inquiry, and may be taken into the account in determining whether the same conditions attach to any given shipments of freight. And this is all that is done under the construction we adopt. The whole transaction is scanned from the standpoint of the purpose of the law, which is to prevent unjust discrimination by the carrier in dealing with the public. If the conditions of the shipments are not "the same," or substantially so, if the services are not "alike," if the "preferences are undue" or "unreasonable," if the "discrimination is unjust" and unfair, the law has been violated. And, in determining whether these results follow, all the conditions of the shipment from its beginning to its ending are to be considered. All these expressions in the various statutes on the subject of unjust discrimination mean the same thing, and the authorities determining the effect of the various statutes on the subject involved are directly in point; and they, as said in the Hoover case, "are very clear and strong that, when there is an additional freight obtained by means of the lower charge, the discrimination is justified both at common law and under the statutes." It can not be suggested that a denial to the carrier of the right to make these rebates to the manufacturer will in the slightest degree even tend to lower the rates to domestic dealers. The result of the denial can only be disastrous to the manufacturers, particularly within the interior of the State, where cheap coal can not be obtained over water courses. Or, if they are saved, it will be at the expense of the Ken-

Louisville & Nashville R. R. Co. v. Commonwealth.

tucky mines, because all steam coals will be furnished at
the cheap rate from outside the State under the inter-
state commerce act.   It is true that it is not the business
of a common carrier to build up this or that enterprise,
and it can give no rebate to a manufacturer over a dealer
merely because the·use of the coal by the former may
incidentally build up the manufacturing interests of the
State.   But the discrimination is allowable because it is
not an unjust or unreasonable discrimination to give the
rebate when two freight charges are secured instead of
one only, provided always those in the same business are
treated alike, and provided the discrimination is not hurt-
ful to, and does not affect, others who deal in or use coal.
The Goodridge Case, 149 U. S. 680, 13 Sup Ct. 970, 37 L.
Ed. 986, was where there was an undisputed secret dis-
crimination made by the carrier between two competing
"coal merchants," and, the services for each being the
same, the rebate to one of them was held to be an unjust
discrimination.   While certain language of that case is to
the effect that the carrier shall "put all its patrons upon
an absolute equality," this could only mean they were to
be so put when the charges were "for a like service from
the same place, or upon like conditions, and under similar
circumstances"; such being the very terms of the statute
the court was considering.   Upon the conceded facts and
other facts established by the proof, we think there has
been no violation of the law as we interpret it, and the
judgment in each case is reversed, and cause remanded
for proceedings in conformity with this opinion.

JUDGE PAYNTER'S DISSENTING OPINION.

The right of eminent domain enables a railroad to take
private property for public use.   It performs a govern-

mental function in providing a highway for travel and for the transportation of freight. Except private persons for profit undertake the performance of these governmental functions, wise statesmanship, would recognize the necessity, and provide the means for the carrying of passengers and the transportation of the world products. Wisdom counsels and justice demands the control within reasonable limits of the actions and conduct of citizens, and that the burdens which each shall bear shall be reasonable and equally distributed. Where a corporation secures the right to and performs governmental functions, there is an implied reservation in every such grant of the power to exercise reasonable control of its affairs to the end that the public interest may be served, and that persons who use it may be forced only to pay reasonable compensation for the service performed for them, and that the carrier may not be permitted to discriminate against any person entitled to enjoy its use. To accomplish this much-desired result, the people have been concerned to have constitutional provisions adopted and statutes enacted until nearly if not every State in the Union has laws, organic and statutory, for the regulation of common carriers. These laws have been enacted because it is dangerous to have a great unrestrained power in any government. It must be checked; it must be controlled; else the public welfare is threatened. The people are deeply interested in the maintenance of the great highways of travel in this country, and a just sense of right should make them desire to see that those who have invested their capital in them have fair treatment and receive proper reward for the capital invested. They should not, in an effort to restrain these public agencies, be guilty of the spoliation of their property. The regulations which

they impose should be just and reasonable. While this is true, they should never grow weary of watching in an effort to properly restrain agencies performing governmental functions. Those who control the aggregated wealth invested in them sometimes grow insolent and arrogant, forgetting they owe any duty to the public, and deny the right of the people to have enacted and enforced reasonable laws for their regulation. While the courts should stand between regulations to enforce which would be spoliation of the property of the public agency, yet they should stand between the Constitution and those who would destroy some of its provisions. Although a court may not agree with the policy which induced the enactment of a constitutional provision, it can never justify itself in the destruction of that provision of the Constitution in the method of its interpretation. It is the power—the people—which created the Constitution that should change its provisions, not the judiciary. That body, above all others, should sustain and enforce it. In the Lake Front Cases, 146 U. S. 387, 13 Sup. Ct. 110, 36 L. Ed. 1018, Mr. Justice Field said: "The trust devolving upon the State for the public, and which can only be discharged by the management and control of property in which the public has an interest, can not be relinquished by a transfer of the property. . . . The State can no more abdicate this trust over property in which the whole people are interested than it can abdicate its power in the administration of government and the preservation of the peace. In the administration of government the use of such powers may, for a limited period, be delegated to a municipality or other body, but there always remains with the State the right to revoke those powers, and exercise them in a more direct manner, and one more conformable to its wishes."

In Railroad Co. v. Smith, 128 U. S. 174, 9 Sup. Ct. 47, 32 L. Ed. 377, Chief Justice Waite said: "Where property is thus affected [with a public use], the business in which it is used is subject to legislative control. So long as use continues, the power of regulation remains; and the regulation may extend, not merely to provisions for the security of passengers and freight against accidents, and for the convenience of the public, but also to prevent extortion by unreasonable charges, and favoritism by unjust discrimination. This is not a new doctrine, but old doctrine, always asserted whenever property or business is, by reason of special privileges received from the government, the better to secure the purpose to which the property is dedicated or devoted, affected with a public use." The constitutional convention, being impressed with the idea that a common carrier should charge one person or company the same as another person or company for like service, adopted as part of the Constitution a provision against any discrimination in rendering like services for any person, corporation, or company. The Constitution does not provide for or authorize just discrimination or reasonable discrimination. The convention regarded that any discrimination was unjust and unreasonable, hence it intended that neither the courts nor the railroad commission should be called upon to determine whether the discrimination was unjust or unreasonable, therefore it used simple and unambiguous terms in prohibiting any discrimination in receiving, handling and transporting freight.

The sections of the Constitution bearing upon the question here involved read as follows:

(214) "No railway, transfer, belt line or railway bridge company shall make any exclusive or preferential contract or arrangement with any individual, association, or cor-

poration, for the receipt, transfer, delivery, transportation, handling, care or custody of any freight, or for the conduct of any business as a common carrier."

(215) "All railway, transfer, belt lines or railway bridge companies shall receive, load, unload, transport, haul, deliver and handle freight of the same class for all persons, associations or corporations from and to the same points and upon the same conditions, in the same manner and for the same charges, and for the  ame method of pay ment."

The indictments are under section 215. That section recognizes that it is proper that freight should be classified, and the charges for carrying it fixed on such classification. The offense charged is not that there was not a proper classification, but that the carrier placed all coal in one class, and then gave a rebate to those who used it for a particular purpose. The carrier, by its tariff sheet, informed the people of Lebanon that it would discriminate in the charges for the shipment of coal against all who did not use it for steam purposes. It is not a question of the classification of coals, but of shippers. The character and quality of coal can enter into the question of its classification, but the uses to which one shipper may put it can never take it from its class for the purpose of making a difference in the rate of transportation. Section 215 is a command to all railways to receive, load, unload, transport, haul, deliver, and handle freight of the same class for all persons, etc., from and to the same points, and upon the same conditions, in the same manner, and for the same charges and for the same method of pay. ment. They are not only required to carry it in the same manner, and for the same charges, but the framers of the Constitution did not intend that one shipper of freight

of a certain class should even have any preference over another shipper of the same class of freight in the payment of the charges. While the word used in the section commanding the reception and transportation of the freight may be broad enough to cover every act connected with its shipment, yet so anxious were those who framed the Constitution to prevent discriminations that they added that freight of the same class should be carried for all persons, etc., "upon the same conditions, in the same manner." They endeavored to use every word possible to prohibit discriminations between shippers of the same class of freight from and to the same points. Both carrier and shipper are protected by the clause to the effect that it shall be shipped "in the same manner;" that is to say, that it shall be shipped in the usual bulk, in the same kind of cars, etc., and in the usual way. The phrase "upon the same conditions" was not inserted for the benefit of the carrier, but for the protection of the shipper. It was used to prevent any kind of discrimination resulting from any restriction, regulation, act or manner of receiving and handling or transporting freight. It was intended to comprehend every act or regulation not embraced in the specific terms used in the section. It has no reference to the business which the shipper may be conducting, his financial condition, the subsequent shipment of other products over the line of the carrier, or the profit which the carrier may derive therefrom. The word "conditions" does not qualify any other word or sentence in the section. It does not make conditional the imposition of the same charges when the same class of freight is shipped from and to the same points; neither does it provide for exceptional cases in the matter of charges, etc. It is used in the sense of stipulations, arrangements.

Louisville & Nashville R. R. Co. v. Commonwealth.

The word does not have reference to the carrier and ship-per in a business or personal sense, but to the contract or terms of shipment, whether they be expressed or im-plied. In order to justify the interpretation given the word, the court has transposed the words of the section, although grammatically constructed, and has interpolated into it the word "unjust." The section, as transposed, is not susceptible of the construction given it by the court. It is admitted by the court that the words "unjust dis-crimination and undue or unreasonable preference" are not found in our Constitution, but it claims the Constitu-tion uses the broader and more comprehensive expres-sion "upon the same conditions." We have endeavored to show that the use to which the transported product is applied is not a condition or element to be considered. To illustrate the meaning of the court, it furnishes an ex-ample of the shipment of coal in the month of July and in the month of December. Of course, it does not follow, because the carrier charged a certain price in July to A, that B is entitled in December to have the same thing shipped for the same charges. But, if the carrier ships a car load of coal in July for A. and a car load for B. of the same class, from and to the same point, under the tariff rates then prevailing, the charge must be exactly the same. So, in December, when the shipments of the same class of freight are made from and to the same points, all persons are entitled to have it done for the same charge, as fixed by the tariff rates then prevailing. The illustra-tion of the court is an unfortunate one if it was intended to support the construction which it has given to the sec-tion.

The court is again unfortunate in its effort to illustrate the correctness of its position when it quotes from Inter-

state Commerce Commission v. Baltimore & O. R. Co., 145 U. S., 263 12 Sup. Ct., 844, 36 L. Ed., 699, where the court said: "It is not all discriminations or preferences that fall within the inhibition of the statute (interstate commerce act); only such as are unjust or unreasonable. For instance, it would be obviously unjust to charge A. a greater sum than B. for a single trip from Washington to Pittsburg; but, if A. agrees not only to go, but to return by the same route, it is no injustice to B. to permit him to do so for a reduced fare, since the services are not alike, nor the circumstances and conditions substantially similar, as required by section 2 to make an unjust discrimination." Of course, the services there performed are not alike. Instead of selling a ticket from one place to another, one was supposed to be sold to a given point and return. If it had been a discrimination, as the interstate commerce act recognized just discrimination, the court would have held that the selling of such a round-trip ticket was not unjust discrimination. The court, however, did say it would have been obviously unjust to charge A. a greater sum than B. for a single trip from Washington to Pittsburg. That is the offense charged in this case. It was the discrimination in the charges for the transportation of the same class of freight from one point to another. Suppose B. had not bought a round-trip ticket from Washington to Pittsburg, but bought a trip ticket from Washington to Pittsburg, and, under the rule of the company, if his purpose in going to Pittsburg was to buy goods, and ship them to Washington over the carrier's line, it would give him a rebate on the charge of transportation from Washington to Pittsburg, can anybody believe for a moment that the court in that case would have given an opinion that that was not an unjust discrimination? If the Lebanon millers are enti-

tled to have a rebate upon the coal they ship over ap-
pellant's line, used for steam purposes, because the car-
rier carries wheat to the mill and flour from it, then a
discrimination is made by reason of the volume of business
which the owners of the mill furnish the carrier.   Every
other element is ignored in fixing rates, and discrimination
becomes the rule, not the exception to it.   It is a discrimi-
nation against every person who uses coal in the city of
Lebanon.   If the volume of business which a shipper fur-
nishes the road will justify a carrier in giving him a less
rate than other shippers receive for like service, then it
follows that the freight rates are not to be fixed accord-
ing to the mandates of the Constitution, but according to
the volume of business that is carried on by a shipper
over the line of the carrier.   It logically follows that, if
there is a flour mill in Lebanon which manufactures only
half so much as the mill in question, and only supplies half
of the amount of business for the carrier, it would be au-
thorized to fix the freight rates according to the volume
of business each should furnish it.   If one man should be
engaged in the retail dry goods business in Lebanon, and
another should be engaged in the retail and
wholesale dry goods business there, then, because
the wholesale man might reship some of the goods
received by him over the line of the appellant,
it could give him a less rate on the goods shipped
by him than those shipped by the retail man.
Again, suppose two gentlemen were engaged in that city
in the grocery business, both of whom purchased their
goods in Louisville, and from that point shipped them to
Lebanon.   One sold his goods for cash, and, of course,
would have nothing to ship over the line of the appellant
which he had taken in exchange for his goods; but the
other grocery man exchanged all his goods for butter,

eggs, poultry, and farm products, and found a market for them elsewhere, and to reach it, it was necessary to ship them over the line of the appellant. If the reasoning of the court be sound, then the carrier would be justified, owing to the difference in the method which these two grocery men employed in conducting their business, and the profits which the appellant derived from the grocery man who exchanged his goods for other products, in charging the trading grocery man less for the transportation of his groceries to Lebanon than the one who sold for cash. Suppose, again, two men were engaged in the milling business at Frankfort, Ky., and the appellant transported the coal and wheat used by each of them from the same point, and that one of them shipped the products of his mill to market over the line of the appellant and the other shipped the product of his mill by the Kentucky river; if the business which the appellant would receive from the manufacturers of flour in the transportation of freight for them is to enter into the question of fixing the charges for the transportation of the coal necessary to operate their mills, the appellant would be justified in charging a less rate on the coal transported for the one who shipped the products of his mill over its line, although the coal may have been shipped from the same point, and at the same time.

It is said that it is not injurious to domestic consumers of coal in Lebanon that those who use it for steam purposes pay a less freight rate for its transportation. That is no reason for giving an interpretation to the Constitution which does violence to its language and purpose. It is true, one of the evils intended to be remedied was to prevent discrimination by carriers which would foster one and injure or destroy another business along this line. There, however, was another great and weighty considera-

tion with the constitutional convention, and that was that a carrier should be required to treat each citizen with equal fairness and consideration. It thought it was only reasonable that a carrier should carry the same quantity of the same class of freight from and to the same points for all persons for the same charge. It therefore enacted the provision of the Constitution in question. To show that was the purpose of the convention, section 214 prohibits a railroad company from even making any exclusive or preferential contract with any individual, association, or corporation for the receipt, transfer, delivery, transportation, handling, care, or custody of any freight, or for the conduct of any business as a common carrier. So the two sections, taken together, not only prohibit any discrimination, but prohibit the making of any contract of arrangement that would have that effect. The court cites but one case (Hoover v. Railroad Co. [Pa. Sup.], 27 Atl., 282) which enunciates the doctrine that a railroad company may give to a manufacturer preferential rights in the transportation of his fuel because it derives a profit from the transportation of his manufactured products over its line. The court was construing a statute containing language materially different from the provisions of our Constitution. The statute in that case prohibited the carrier from making "any undue or unreasonable discrimination." That language implies that a discrimination can be made so long as it is not undue and unreasonable, while our Constitution does not recognize any discrimination as being reasonable or just. The court in Interstate Commerce Commission v. Baltimore & O. R. Co. had under consideration certain provisions of the interstate commerce act. The language of that act with reference to discrimi-

nations differs widely from the provisions of our Constitution. Under sections 2 and 3 of that act, as adjudged in that case, the unlawfulness denied by sections 1 and 3 was "unjust discrimination," or "an undue and unreasonable preference or advantage." The court held that under those sections the possibility of just discriminations and reasonable preferences were recognized. The supreme court of the United States in Railway Co. v. Goodridge, 149 U. S., 680, (13 Sup. Ct., 970), (37 L. Ed., 986), had under consideration section 6, art. 15, Const. Colo., which reads as follows: "All individuals, associations, and corporations shall have equal rights to have persons and property transported over any railroad in this State, and no undue or unreasonable discrimination shall be made in charges or in facilities for transportation of freight or passengers within the State, and no railroad company, nor any lessee, manager, or employe thereof, shall give any preference to individuals, associations, or corporations in furnishing cars or motive power." And also section 7, p. 309, Sess. Laws Colo. 1885, which reads as follows: "(Unjust discrimination.) No railroad corporation shall, without the written approval of said commissioner, charge, demand, or receive from any person, company or corporation for the transportation of persons or property, or for any other service, a greater sum than it shall, while operating under the classification and schedule then in force, demand or receive from any other person, company or corporation for a like service from the same place, or upon like conditions and under similar circumstances, and all concessions of rates, drawbacks, and contracts for special rates shall be open to, and allowed all persons, companies and corporations alike, at the same rate per ton per mile, upon like conditions and under similar circumstances, except in special cases de-

signed to promote the development of the resources of this State, when the approval of said commissioner shall be obtained in writing," etc.   While the constitutional provision there in question prohibited undue and unreasonable discrimination, this language recognized the possibility of discriminations that would not be undue or unreasonable. Under the statute made pursuant to the provisions of the Constitution any person aggrieved by a person, company, or corporation who violated the constitutional provision and the statute was entitled to recover three times the amount of the actual damages sustained or overcharges paid.   The injured parties sought to recover under that statute.   The company had charged one shipper for freight on coal over and above what it charged another for the like service.   The court held that this could not be done, and adjudged that the plaintiff was entitled to recover. The conclusion was reached that such discrimination was undue and unreasonable.   This court, under a constitutional provision which prohibits any discrimination, holds that to charge one shipper more for like services than another is not unjust discriminaton.   Under the opinion   of   the court, if two consumers of coal at Lebanon should have exactly the same quantity of coal of the same class shipped from the same point in Kentucky over appellant's line to Lebanon, and one of them should save the ashes of the coal, and ship them over appellant's line, it could give him a rebate on the coal shipped by him because of the business given it in the transportation of his ashes.   Besides, it would logically follow from the opinion that the more of other freight shipped for a consumer of coal the greater the rebate the carrier would be authorized to give on the coal shipment without being guilty of unjust discrimination.   So the result would be that the charges for the ship-

ment of coal would never depend upon the kind of service
rendered in its transportation, but upon the volume of
other business, which the shipper of coal might furnish
the carrier. If the court was correct in saying the phrase
"and upon the same conditions" did not have reference to
the stipulations, regulations, arrangements, and mode of
shipment, etc., then by the most unnatural, unreasonable,
and arbitrary method the court gives it a meaning not
warranted by the letter or the spirit of the law, for it jus-
tifies a discrimination, not upon any difference in the time
of shipment of the coal, or the quantity shipped, or cir-
cumstances or conditions affecting the shipment, but be-
cause the carrier transports products other than coal for
the shipper. So anxious was the court to interpolate the
words "unjust discrimination" in section 215 that it quotes
section 196, which contains these words, the court adding
that section 215 is part of the scheme covered by sections
196 and 214. Sections 214, 215, 216, and 217 refer to rail-
roads, transfer, belt lines, and railway bridge companies
organized under the laws of Kentucky, etc. These sections
in plain terms designate the common carriers mentioned,
and seek to regulate them in the manner therein provided,
and they appear in the Constitution under a heading "Rail-
roads and Commerce." While it used the words "unjust
discrimination," it can not with reason be contended that
section 196 was intended to qualify the meaning of section
215. The part of section 196 relied upon simply declares
that the Legislature should enact laws to prevent unjust
discrimination by railroads, steamboats, or other common
carriers. Section 215 prohibits any discrimination, and,
of course, the Legislature could only enact a law which
would prevent any discrimination by railroads. It was not
intended to confer upon the Legislature the right to desig-

nate what might be unjust discrimination, as section 215 in effect declares that any discrimination is unjust, and that every person is entitled to have the same class of freight shipped at the same price that any other person or company is entitled to have it shipped to and from the same points. If the constitutional convention had intended to leave to the Legislature the right to determine what should constitute unjust discrimination, then it was folly for the constitutional convention to have inserted section 215. It needs no legislation to enforce section 215, as decided by this court in Louisville & N. R. R. Co. v. Com., (48 S. W., 416). Section 217 prescribes the penalty for violation of sections 213, 214, and 215 in express terms, and this court so held. It is absurd to say that section 196 has any connection with section 215, or in any sense bears upon the question of its interpretation. We are of the opinion that any statute is violative of section 215 of the Constitution which authorizes a carrier to make any discrimination in the matter of charging for the carrying of freight of a certain class for any person, company, or corporation from and to the same points. We are also of the opinion that the grand jurors of the various counties of the State have the right, independent of any recommendation of the railroad commission, to return indictments against common carriers for the violation of sections 213, 214, 215, and 216 of the Constitution. The constitutional provisions name the penalties which the carriers incur for the violation of these sections. Legislation is not needed to enforce their provisions, and it was never intended by the framers of the Constitution to take from the grand jurors of the several counties of the State the right to inquire into and indict persons who violate the provisions of the Constitution to which we have referred. The power which created.

the Constitution provided this court as an instrumentality to uphold it. Instead of doing so with reference to section 215, it has, as we believe, practically destroyed it by its opinion in these cases.

Judges White and Guffy concur.